710 A.2d 1060 (1997)
311 N.J. Super. 637
BOARD OF CHOSEN FREEHOLDERS OF the COUNTY OF MORRIS, Plaintiff,
Board of Chosen Freeholders of the County of Camden and Board of Chosen Freeholders of the County of Bergen, Plaintiffs-Intervenors,
v.
STATE of New Jersey, Defendant.
Superior Court of New Jersey, Law Division, Morris County.
Decided April 24, 1997.
*1061 Ronald Kevitz, Morris County Counsel, appeared for the County of Morris.
Donna M. Whiteside, Assistant Camden County Counsel, appeared for the County of Camden.
Anthony De Candia, Assistant Bergen County Counsel, appeared for the County of Bergen.
Jaynee LaVecchia, Assistant Attorney General, and Karen DuMars, Deputy Attorney General, appeared for the State of New Jersey.
STANTON, A.J.S.C.
Morris County, joined by Camden County and Bergen County, has brought this declaratory judgment action seeking a ruling from the Court with respect to whether the State of New Jersey or the various counties are responsible to pay for the construction costs and any related borrowing costs of courthouses constructed, expanded or renovated after July 1, 1993. (Construction costs and any related borrowing costs are hereinafter usually referred to as "capital costs.") There are no facts in dispute in this case. The parties have moved and cross-moved for summary judgment.
It is useful to refer briefly to the history of the financing of the court system in New Jersey. The present New Jersey Constitution was adopted in 1947. Prior to 1992, the constitution was completely silent with respect to whether the State or the various counties should pay for the housing and operation of the court system. Responsibility for the financing of the court system was handled entirely by statute. Up until 1991, statutory provisions regarding financing the court system were scattered throughout Title 2A. In 1991, a new Title 2B was created to deal with court organization, and the various statutory provisions were reorganized and collected in Title 2B. In general, the various statutes provided that the State would pay the salaries of all justices of the Supreme Court, all judges of the Superior Court and all judges of the Tax Court. The State would pay the salaries of judicial employees staffing the Supreme Court, the Appellate Division of the Superior Court, the Administrative Office of the Courts, the Office of the Clerk of the Superior Court, the Tax Court and the General Equity Part of the Chancery Division of the Superior Court. All other judicial employees were to be paid by the counties.
In many states, probation employees are employees of the executive branch of government. In New Jersey, probation employees have historically been employees of the judicial branch of government, and the various applicable statutes required that their salaries be paid by the counties. The actual patterns of staffing the various courts and court offices worked out in such a way that the State paid the salaries of approximately 20% of the non-judge employees serving the court system, while the counties paid the salaries of approximately 80% of the non-judge employees serving the court system.
The statutory provisions regarding physical facilities, equipment and supplies divided responsibility in broadly the same fashion. Thus, the State was responsible for paying for physical facilities, equipment and supplies for the Supreme Court, the Appellate Division of the Superior Court, the General Equity Part of the Chancery Division of the Superior Court, the Tax Court, the Administrative Office of the Courts and the Office of the Clerk of the Superior Court. The various counties were required to pay for physical facilities, equipment and supplies for the great bulk of judges of the Superior Court who served in the Law Division (both Civil and Criminal Parts) of the Superior Court and the Family Part of the Chancery Division of the Superior Court. Again, the staffing of the various courts worked out in such a way that the counties have historically paid *1062 much more for housing, equipping and supplying the court system than has the State.
In New Jersey, most of the important decisions with respect to the organization, staffing and management of the court system are made at the State level. In recent years, a consensus has developed that the State should assume greater responsibility for paying the costs of the court system. In terms of basic legal power, the Legislature could have provided by simple statutory enactment for shifting more of the burden of court costs to the State. However, the Legislature decided that it would be better to seek broad public support for the shift. Accordingly, on June 29, 1992, the Legislature adopted a concurrent resolution known as SCR-58 which placed a proposed constitutional amendment on the statewide ballot in the general election which was held in November, 1992. The proposed amendment was approved by the electorate and became effective on December 3, 1992 as Section VIII of Article VI (the Judicial Article) of the New Jersey Constitution. Section VIII reads in full as follows:

SECTION VIII
1.a. On or before July 1, 1997:(1) The State shall be required to pay certain judicial and probation costs; (2) All judicial employees and probation employees shall be employees of the State; and (3) Any judicial fees and probation fees collected shall be paid to the State Treasury.
b. As used in this section: (1) "Judicial facility costs" means any costs borne by the counties prior to July 1, 1993 with regard to the operation and maintenance of facilities used by the courts or judicial employees; (2) "Probation facility costs" means any costs borne by the counties prior to July 1, 1993 with regard to the operation and maintenance of facilities used by probation employees; (3) "Judicial costs" means the costs incurred by the county for funding the judicial system, including but not limited to the following costs: salaries, health benefits and pension payments of all judicial employees, juror fees and library material costs, except that judicial costs shall not include costs incurred by employees of the surrogate's office or judicial facility costs; (4) "Judicial employees" means any person employed by the county prior to July 1, 1993 to perform judicial functions, including but not limited to employees working for the courts, and the law library and employees of the sheriff's office who act as court aides, except that employees of the surrogate's office and probation employees shall not be construed to be judicial employees; (5) "Judicial fees" means any fees or fines collected by the judiciary but shall not include sheriff's or surrogate's fees or municipal court fees or fines; (6) "Judicial functions" means any duties and responsibilities performed in providing any services and direct support necessary for the effective operation of the judicial system; (7) "Probation costs" means any costs incurred by the county for the operation of the county probation department, including but not limited to the cost of salaries, health benefits, and pension payments of probation employees but shall not include probation facility costs; (8) "Probation employees" means any person employed by a county probation department prior to July 1, 1993; (9) "Probation fees" means any fees or fines collected in connection with the probation of any person.
If we look at the text of Section VIII, we see that it is divided into two paragraphs. Paragraph a is the operational paragraph, while paragraph b contains a number of definitions. If we examine the operational paragraph more closely, we see that it contains three provisions:
(1) The State shall be required to pay certain judicial and probation costs; (Emphasis added.)
(2) All judicial employees and probation employees shall be employees of the State; and
(3) Any judicial fees and probation fees collected shall be paid to the State Treasury.
Operational provision (2) is clear and straightforward: "All judicial employees and probation employees shall be employees of the State." When we look at that language, *1063 we have no doubt that all of the judicial employees and probation employees who were previously employees of the various counties shall become employees of the State, and it follows from that shift that all expenses for those employees shall be paid by the State. The language of operational provision (3) is also clear and straightforward: "Any judicial fees and probation fees collected shall be paid to the State Treasury." This language makes it clear that all fees collected by the judiciary and by probation departments in the future shall be paid to the State Treasury.
The language of operational provision (1) is, however, not very clear and straightforward: "The State shall be required to pay certain judicial and probation costs." When we look at that language, we can see that there is an indication that the State will be required in the future to pick up some judicial and probation costs which it has not previously paid, but it is not clear to what extent costs will be picked up. The use of the word "certain" indicates that the State will not pick up all of the judicial costs or all of the probation costs. However, it does not indicate with any precision what portion of those costs will or will not be picked up. If we look at the definition of judicial costs given in the definitional paragraph of Section VIII we get some guidance: "`Judicial costs' means the costs incurred by the county for funding the judicial system, including but not limited to the following costs: salaries, health benefits and pension payments of all judicial employees, juror fees and library material costs, except that judicial costs shall not include costs incurred by employees of the surrogate's office or judicial facility costs". The inclusive portion of the definition of judicial costs gives some meaningful indication of what is included, but it is not an airtight indication. The excluding portion of the definition indicates that surrogate's office costs and judicial facility costs are not to be included. There is another definitional provision which deals with judicial facility costs as follows: "`Judicial facility costs' means any costs borne by the counties prior to July 1, 1993 with regard to the operation and maintenance of facilities used by the courts or judicial employees". It is important to note that the special definition of judicial facility costs contained in Section VIII does not make any specific reference to the capital costs of constructing courthouses. It is also important to note that no other portion of the definitional paragraph of Section VIII makes any reference to capital costs for courthouse construction. In my view, the most sensible way to read the entire definitional paragraph of Section VIII is to say that it simply omits any reference to capital costs for construction. It can be argued, as at least one of the counties has argued, that the phrase "judicial costs" as it is used in Section VIII includes the capital costs of constructing courthouses, because historically the counties have paid for such costs, and, thus, such costs should be included within the concept of "costs incurred by the county for funding the judicial system". Here we must note that the phrase "judicial facility costs," if used without any special definition, would be understood by most people to include both the capital costs involved in the construction of courthouses and the operational costs involved in the maintenance of courthouses. However, the phrase "judicial facility costs" has been specially defined in such a way that it includes only the costs related to the operation and maintenance of courthouses. Thus, a careful reading of the inclusive concept of "costs incurred by the county for funding the judicial system" in juxtaposition to a careful reading of the specially defined excluding phrase of "judicial facility costs" might lead one to the conclusion that the phrase "judicial costs" as used in Section VIII is meant to include the capital costs of constructing courthouses. The counties have urged that this is the way the language is to be read, and, when that is put together with the date of July 1, 1993, the counties urge that the responsibility after July 1, 1993 for the construction of courthouses or the expansion or renovation of courthouses rests with the State rather than with the county.
It seems to me that this very careful reading of the definitional paragraph of Section VIII is too technical and too literal and that it ends up being unrealistic and misleading. In any event, even if one were to read the definitional paragraph of Section VIII as literally *1064 as the counties would have us read them, there still would not be clear guidance with respect to responsibility for the construction of courthouses after July 1, 1993. The only thing the literal reading of the definitional terms would accomplish is that it would lead us to include the capital costs for construction of courthouses within the concept of "judicial costs." But we would still not know whether the State was required to pick up those costs, because the fundamental operational provision of Section VIII is that "The State shall be required to pay certain judicial and probation costs." (Emphasis added.) Even if capital costs for construction are to be included within the concept of "judicial costs", the ultimate reality is that the State is not required by the operational provision of Section VIII to pick up all judicial costs, and we have no clear guidance within the four corners of Section VIII to let us know whether capital costs for construction are among the "certain" costs to be picked up by the State.
The legislative history of SCR-58 is sparse. When originally introduced in the Legislature, SCR-58 did not define judicial costs to exclude judicial facility costs. The resolution was, however, amended in the Senate Judiciary Committee on June 8, 1992, and one of the amendments referred to judicial facility costs and excluded them from the definition of the judicial costs which were to be picked up by the State. The Senate Judiciary Committee in its statement accompanying the amendment noted that the "amendments adopted by the committee clarify that costs presently borne by the counties with regard to the operation and maintenance of facilities used by the courts and probation departments would not be assumed by the State." However, there is nothing in the legislative history of SCR-58 dealing with the responsibility for the capital costs for construction of new, expanded or renovated judicial facilities. As noted above, SCR-58 was adopted by the Legislature on June 29, 1992. Eighteen days later, a Legislative Fiscal Estimate to SCR-58 was released by the staff of the Office of Legislative Services. That Estimate stated in part that the State "would be specifically exempted from assuming costs ... related to the ongoing operation and maintenance of facilities used by judicial ... employees prior to July 1, 1993. The operational and maintenance costs of such facilities created after July 1, 1993 would be a State fiscal responsibility." A Legislative Fiscal Estimate frequently is very useful in ascertaining legislative intent. This particular Fiscal Estimate, however, is not useful, because it was not prepared until well after the Legislature had already enacted SCR-58 and could not have any impact on the legislators as they deliberated and voted on SCR-58.
N.J.S.A. 19:3-6 provides that whenever a proposed amendment to the State Constitution is placed on the ballot, it is to be accompanied by a brief statement interpreting the proposed amendment. The interpretive statement accompanying the proposed amendment which became Section VIII read in full as follows:

INTERPRETIVE STATEMENT
Adoption of this amendment would require the State to assume by July 1, 1997 certain costs now borne by county taxpayers in connection with the judicial system. County employees employed by the court system and all employees of county probation departments would become State employees by that date. The State would be responsible for their salaries, health benefits and pension payments. As of that date, all judicial fees and probation fees would be paid to the State Treasury.
The interpretative statement says absolutely nothing about any of the costs, whether capital or operational, for physical facilities for the court system. In adopting SCR-58, the Legislature gave no indication whatever that it intended the State to assume any responsibility for the costs of constructing physical facilities for the court system. When the electorate voted on the proposed constitutional amendment which became Section VIII of Article VI, it had nothing in the text of the proposed amendment or in the interpretative statement accompanying it to suggest that the State would be required to assume any responsibility for capital costs in connection with physical facilities for the *1065 court system, and the only clear reference to operational costs for physical facilities indicated that such costs would continue to be borne by the counties.
I believe it is useful to take a brief look at the history of the court system in New Jersey in considering whether Section VIII should be interpreted in a way which requires the State to assume any costs in connection with physical facilities for the court system. Before the present New Jersey Constitution was adopted in 1947, there were a relatively large number of trial courts exercising varying jurisdiction. The judges of the Circuit Courts, the judges of the Courts of Common Pleas and the judges of the Juvenile and Domestic Relations Courts held their court sessions in courthouses which were constructed and maintained in each county by the county government. Those judges dealt with cases which were venued in the particular county in which they sat. The judges of the Chancery Court, on the other hand, typically had jurisdiction over cases arising in two or more counties and they held their court sessions in facilities which were rented by the State in commercial office buildings. After the present New Jersey Constitution was adopted in 1947, the judges of the old Chancery Court were physically moved into the county courthouses, but the State paid rent to the counties for the space used by those judges. At the present time, there are approximately 355 judges sitting in the trial divisions of the Superior Court throughout New Jersey. Of that number, approximately 335 are assigned to the Law Division (including both Civil and Criminal Parts) and to the Family Part of the Chancery Division. The counties are presently bearing all of the costs of supplying and maintaining physical facilities for those 335 judges. Approximately 20 judges sit in the General Equity Part of the Chancery Division. Those 20 judges are the current functional equivalent of the pre-1947 Vice Chancellors of the old Chancery Court. The judges of the General Equity Part sit in facilities which are physically supplied and maintained by the counties, but the State pays rent to the counties for those facilities. Thus, the counties are presently bearing the full costs, both capital and operational, for supplying physical facilities for practically all of the trial judges of the Superior Court. Each of the 21 counties of New Jersey has at least one courthouse which it owns and operates, and many counties have courthouse complexes containing a number of buildings housing the court system. Every county has a substantial capital investment in physical facilities for the courts, and many are carrying substantial indebtedness in connection with those facilities. In addition, a few counties are renting some space in commercial buildings for a portion of their court operations. The costs of maintaining and operating the existing judicial facilities are very sizable. As time goes on, it will be necessary to construct new physical facilities for the courts, and that will cost large additional sums of money. The counties have also been supplying and maintaining office facilities for probation employees, and what has been said above about judicial facilities applies broadly to probation facilities.
It seems to me that if the Legislature in proposing the constitutional amendment which became Section VIII of Article VI had intended to shift capital costs for physical facilities to the State, it should have said so in reasonably clear terms. It also seems to me that the Legislature was bound to give fair notice of that shift to the electorate in the language it inserted into the proposed amendment. I also note that, if the proposed amendment was intended to shift the capital costs of judicial facilities and probation facilities to the State, it would have been quite easy to have drafted language which stated that in clear terms.
My interpretation of Section VIII is that it simply does not say anything about the capital costs for judicial facilities. It does not say anything about the responsibility for supplying physical facilities for the court system. The same is true with respect to physical facilities for probation employees. My conclusion is that Section VIII has no impact whatever upon the responsibility for supplying physical facilities for the court system or for probation employees. Accordingly, that responsibility is determined, not by any constitutional provision, but by ordinary legislative enactments.
*1066 The definitional paragraph of Section VIII defines judicial facility costs as meaning "any costs borne by the counties prior to July 1, 1993 with regard to the operation and maintenance of facilities used by the courts or judicial employees". The counties have argued that this language indicates that county responsibility for the maintenance and operation of judicial facilities and probation facilities applies only to facilities which were actually in existence on July 1, 1993. I do not accept that view. It seems to me that the date of July 1, 1993 was used to indicate the type of costs borne by the counties, and was not meant to identify on a perpetual basis any actual facilities.
This interpretation of the significance of the date July 1, 1993 becomes clearer if we look at the use of that date with respect to identifying judicial employees and probation employees. There are currently approximately 8,600 persons working either as judicial employees or probation employees in New Jersey. The identity of the actual human beings included in that group changes somewhat from day to day, and over a year or two changes fairly considerably. There are many individual human beings working for the court system today who were not working for the court system on July 1, 1993, but their status is clearly governed by the provisions of Section VIII, because it is obvious that the amendment was intended to apply to types and categories of employees rather than to particular human beings. The make-up of judicial and probation facilities does not, of course, change as rapidly as the make-up of the workforce, but, over a long period of time, it will change considerably. I do not think it would make sense for the responsibility for maintenance and operational costs to depend upon the date upon which a particular facility was constructed.
Legislative action taken after Section VIII had been adopted by the voters in November, 1992 indicates that the Legislature does not believe that Section VIII shifted the responsibility for the construction, expansion or renovation of judicial facilities to the State. In the first place, the Legislature allowed N.J.S.A. 2B:6-1 to stay in place without any formal amendment. N.J.S.A. 2B:6-1 had been adopted by the Legislature in 1991. At the time of its adoption, it codified financial practices which had been in place for many years and which had been embodied to some extent in earlier provisions of Title 2A. Subsection b of N.J.S.A. 2B:6-1 provides: "Each county shall provide suitable courtrooms, chambers, equipment and supplies necessary for the processing and decision of cases from that county in the Law Division and the Family Part of the Chancery Division." In 1993, the Legislature adopted the State Judicial Unification Act, N.J.S.A. 2B:10-1, et seq., and the Judicial Employees Unification Act N.J.S.A. 2B:11-1, et seq. Those acts were intended to implement Section VIII and they provided rather comprehensively for a shifting of judicial employees from county payrolls to the State payroll and for the shifting of many county costs to the State over a period of years ending in 1997. A section of the State Judicial Unification Act, N.J.S.A. 2B:10-7, did specifically provide for the shifting of furnishings and office equipment used by the courts from the counties to the State, to be effective on January 1, 1995. Two other sections of the Act, N.J.S.A. 2B:10-3c and N.J.S.A. 2B:10-4a, required the State to pay for furnishings, office equipment and supplies used by the court system. These provisions amounted to an implied repeal of portions of subsection b of N.J .S.A. 2B:6-1, but it is to be noted that the State Judicial Unification Act is totally silent on the question of responsibility for providing courtrooms and chambers for the courts. Thus, the portion of 2B:6-1b requiring the counties to provide courtrooms and chambers for the Law Division and the Family Part of the Chancery Division of the Superior Court remains in force. Accordingly, the Legislature has clearly indicated that it believes that Section VIII does not require the State to assume any responsibility for the provision of judicial facilities, and it has further indicated that it does not intend to exercise its discretion to assume any costs with respect to judicial facilities.
My conclusion is that Section VIII of Article VI does not require the State to assume any of the costs for supplying or maintaining physical facilities for the court system or for probation employees. Those costs remain the responsibility of the counties. That ruling applies to facilities which *1067 were in existence on July 1, 1993, and to any facilities which have been constructed after that date or which may be constructed in the future.
As noted above, the drive to shift judicial system costs from the counties to the State was based upon the reality that most of the important decisions with respect to the organization, staffing and management of the system are made at the State level. Pursuant to Section VIII and legislation implementing it, approximately $240,000,000 in costs are being shifted each year from the counties to the State.
It could, of course, be urged that the same policy considerations which led to the shift of these large annual costs would justify shifting the costs for physical facilities from the counties to the State. On the other hand, it must be noted that there is a strong connection between the work that takes place in a particular county courthouse and the people of the county in which that courthouse is located. In criminal cases, the crimes charged against the defendant allegedly took place in that county. In civil and family cases, at least one of the parties resides in the county in which the case is being handled. The judges, court staff and probation staff working in a particular county are handling cases that very closely involve the people of that county. Hence, it can be argued that it is fair for the taxpayers of the county to pay some meaningful portion of the costs for the judicial system in the county, and a practical and fair way to accomplish that might be to make the county responsible for the costs of supplying and maintaining the necessary physical facilities. The policy issues involved here are ultimately the responsibility of the Legislature and the electorate. In the meanwhile, I believe that the correct judicial interpretation of Section VIII and relevant legislation is that physical facility costs remain the responsibility of the counties.
This opinion supersedes the oral opinion which I delivered from the bench on April 18, 1997.