732 A.2d 1053

BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF MORRIS, PLAINTIFF–APPELLANT, v. STATE OF NEW JERSEY, DEFENDANT–RESPONDENT.

BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF CAMDEN, PLAINTIFF–INTERVENOR–APPELLANT, v. STATE OF NEW JERSEY, DEFENDANT–RESPONDENT.

BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF BERGEN, PLAINTIFF–INTERVENOR–APPELLANT, v. STATE OF NEW JERSEY, DEFENDANT–RESPONDENT.

Argued October 26, 1998—Decided July 20, 1999.

*Ronald Kevitz,* Morris County Counsel, argued the cause for appellant Board of Chosen Freeholders of the County of Morris.

*Robert G. Millenky,* Camden County Counsel, argued the cause for appellant Board of Chosen Freeholders of the County of Camden (*Mr. Millenky,* attorney; *Deborah Silverman Katz,* Assistant County Counsel, on the brief).

*Ellen D. Julis,* Bergen County Counsel, argued the cause for appellant Board of Chosen Freeholders of the County of Bergen.

*Charles Dante DiPirro,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney; *Jaynee LaVecchia,* Former Assistant Attorney General, on the brief).

*David A. Wallace,* Warren County Counsel, argued the cause for *amicus curiae,* Board of Chosen Freeholders of the County of Warren.

The opinion of the Court was delivered by

PORITZ, C.J.

This appeal raises the question whether the construction and related borrowing costs associated with building, renovating and expanding judicial facilities, hereinafter usually referred to as "capital costs," are to be assumed by the State under a 1992 amendment to the New Jersey Constitution, *N.J. Const.* art. VI, § VIII, ¶ 1, that governs state funding of the judicial system.

Prior to the amendment, the responsibility for financing the courts was controlled by statute. As enacted in 1991, Title 2B recodified the division of financial responsibility between the State and the twenty-one counties that had been in place for many years. *See Law Revision Commission Comment to N.J.S.A. 2B:5-1* (explaining that the new Title 2B "attempt[s] to reflect current law and practice" with respect to responsibility for judicial costs).[1] *N.J.S.A.* 2B:6-1a allocates to the State the costs of physical facilities for the Supreme Court, the Appellate Division of the Superior Court, and the General Equity Part of the Chancery Division of the Superior Court, whereas *N.J.S.A.* 2B:6-1b requires the various counties to pay for housing the Law Division and the Family Part of the Chancery Division of the Superior Court. We must now determine the impact, if any, of the constitutional amendment on the statutory allocation of fiscal responsibility for judicial facilities between the State and the twenty-one counties.

---

[1] Before recodification, provision for funding the court system could be found at scattered sections of Title 2A.

## I

Senate Concurrent Resolution No. 58 ("SCR–58"), later adopted by the electorate as Article VI, Section VIII, Paragraph 1 of the New Jersey Constitution, was first proposed on May 21, 1992. The purpose of SCR–58 was to require the State to assume greater responsibility for the funding of the judicial system. Toward that end, SCR–58 provided for state assumption of "certain judicial and probation costs" incurred by the counties. *Constitutional Amendment—Judicial and Probation Costs—Transfer from Counties to State, S.C.R. No. 58,* ¶ 1a(1), 1992 *N.J. Sess. Law Serv.* A–3, A–3 (West) (*Constitutional Amendment* ). SCR–58 also included a non-exclusive list of particular items of "judicial costs" to be funded by the State. *See id.* ¶ 1b(3), at A–4.

As originally proposed, the definition of "judicial costs" in SCR–58 did not contain an explicit exclusion for "judicial facility costs." On June 8, 1992, the Senate Judiciary Committee amended SCR–58 to "clarify that costs presently borne by the counties with regard to the operation and maintenance of facilities used by the courts and probation departments would not be assumed by the State." Senate Judiciary Comm., *Statement to Senate Concurrent Resolution No. 58,* at 1 (June 8, 1992). "Judicial facility costs" were then defined as "costs borne by the counties prior to July 1, 1993 with regard to the operation and maintenance of facilities used by the courts or judicial employees," *Constitutional Amendment, supra,* ¶ 1b(1), at A–3, and excluded from the definition of "judicial costs," *id.* ¶ 1b(3), at A–4. The Committee did not, however, mention capital costs in its revision, nor did it explain the significance of the "July 1, 1993" date. As revised, SCR–58 provided, in pertinent part:

1. a. On or before July 1, 1997:

(1) The State shall be required to pay for certain judicial and probation costs;

(2) All judicial employees and probation employees shall be employees of the State; and

(3) Any judicial fees and probation fees collected shall be paid to the State Treasury.

b. As used in this section:

(1) "Judicial facility costs" means any costs borne by the counties prior to July 1, 1993 with regard to the operation and maintenance of facilities used by the courts or judicial employees;

. . . .

(3) "Judicial costs" means the costs incurred by the county for funding the judicial system, including but not limited to the following costs: salaries, health benefits and pension payments of all judicial employees, juror fees and library material costs, except that judicial costs shall not include costs incurred by employees of the surrogate's office or judicial facility costs[.]

[*Id.* ¶ 1, at A–3—A–4.]

On June 15, 1992, the Committee held a public hearing on SCR–58. Chief Justice Robert N. Wilentz submitted a Statement in support, *Public Hearing Before the Senate Judiciary Comm. on Senate Concurrent Resolution No. 58*, June 15, 1992, at 70–81 (Wilentz Statement), as did the New Jersey State Bar Association ("NJSBA"), *id.* at 82–86 (NJSBA Statement). Both Statements praised the amendment as a critical step in the administration of "equal justice" for the people of New Jersey. Wilentz Statement, *supra*, at 78; *see also* NJSBA Statement, *supra*, at 83. In the words of Chief Justice Wilentz:

As far as I am concerned the greatest benefit of this constitutional amendment is its promise of giving us a truly well managed judiciary for the benefit of our citizens. It will give them better justice.

This constitutional amendment will also bring about other substantial improvements. The judiciary will become fully accountable, it will no longer be uncertain, both internally and in its relation to others to whom it should be accountable, including you, why its costs in one vicinage far exceed those in others, why its productivity in one vicinage falls far short of what it is in others, why in one vicinage we need twenty people per judge while in another we need only ten. The answer today is impossibly indefinite, ambiguous, uncertain, all because we have so many different systems, ultimately all because we cannot rationalize our own budgets or control our own work force. . . .

The constitutional amendment will finally, for the first time in our history, start to bring equal justice to all of our citizens. Those counties today that devote more money to justice than others, either because they are richer or more willing, or both, usually get what their money pays for, . . . justice with all of the court-related programs that are so necessary today, the availability of complementary dispute resolution, the services of highly-trained professional staff, all as compared to the justice received by those in the less fortunate counties, threadbare justice with long waiting lines, lacking many of the attributes found in other counties.

[Wilentz Statement, *supra*, at 77–78.]

Neither the Statement of the Chief Justice nor that of the NJSBA referred to judicial facilities. Rather, both Statements focused on the substantial benefit to be derived from unification of the court system through the equalization of funding for the "programs and services" provided by the courts. NJSBA Statement, *supra*, at 83; *see also* Wilentz Statement, *supra*, at 76.

On June 29, 1992, the Legislature approved the revised version of SCR–58, allowing the amendment to be put to a public vote at the November 1992 general election. The ballot question read as follows: "Shall the amendment to Article VI, agreed to by the Legislature requiring the State to assume by July 1, 1997 certain costs now borne by the counties through the county property tax levy in connection with the judicial system, be adopted?" In addition, the following interpretative statement appeared on the ballot:

> Adoption of this amendment would require the State to assume by July 1, 1997 certain costs now borne by county taxpayers in connection with the judicial system. County employees employed by the court system and all employees of county probation departments would become State employees by that date. The State would be responsible for their salaries, health benefits and pension payments. As of that date, all judicial fees and probation fees would be paid to the State Treasury.

The proposed amendment was approved by the electorate and became effective on December 3, 1992.

Subsequently, the Administrative Office of the Courts asked the Attorney General to advise the courts whether, by virtue of the adoption of the amendment, the State had assumed responsibility for the costs of operating, maintaining, constructing and/or expanding court facilities. On September 23, 1996, the Attorney General issued an informal opinion interpreting the amendment. Letter from Peter Verniero, Attorney General of the State of New Jersey, to James J. Ciancia, Director, Administrative Office of the Courts (Sept. 23, 1996). The Attorney General understood "certain" judicial costs to signify that the State was required to assume "some, but not all, judicial costs." *Id.* at 2. Concerning the "judicial facility costs" exclusion, the opinion concluded that

the July, 1, 1993 date was intended merely to indicate "the kinds of costs for which the counties will remain responsible." *Id.* at 3. By this reasoning, the counties remained responsible for costs incurred in "operating, maintaining, constructing, expanding and renovating" current and future court facilities for the Law Division and the Family Part. *Id.* at 7.

Plaintiff Board of Chosen Freeholders of the County of Morris, joined by the Board of Chosen Freeholders of the County of Camden and the Board of Chosen Freeholders of the County of Bergen, sought a declaratory judgment to determine whether the amendment "requires the State or the County to pay for construction costs and capital costs for new or expanded facilities or judicial facility costs after July 1, 1993."

Judge Stanton entertained motions for summary judgment from the parties and issued a decision in which he dismissed with prejudice the declaratory action and held in favor of the State. He reasoned that "certain" judicial costs was ambiguous, as it failed to indicate precisely which costs the State would assume, and observed that neither the definition of "judicial costs" nor the definition of excluded "judicial facility costs" contained in the amendment referred to the capital costs of constructing court facilities. *Board of Chosen Freeholders v. State,* 311 *N.J.Super.* 637, 642–43, 710 *A.*2d 1060 (Law Div.1997). The Counties argued that capital costs should be included within the definition of "judicial costs" because they are not included in the definition of excluded "judicial facility costs." *Id.* at 643, 710 *A.*2d 1060. The court considered, however, that even if it were to include capital costs within the meaning of "judicial costs," the State would not automatically be responsible because the State is not required to assume *all* judicial costs, but only "certain" judicial costs. *Id.* at 644, 710 *A.*2d 1060.

After a careful review of the legislative history of the amendment, and of contemporaneous legislation, Judge Stanton concluded that the amendment had "no impact whatever upon the responsibility for supplying physical facilities for the court system." *Id.*

at 648, 710 *A.2d* 1060. He held that the counties remain responsible for the capital costs of constructing court facilities for the Law Division and the Family Part pursuant to *N.J.S.A.* 2B:6–1b. *Id.* at 649–50, 710 *A.2d* 1060.

On appeal by Morris, Camden and Bergen Counties[2], the Appellate Division affirmed the decision of the trial court. *Board of Chosen Freeholders v. State,* 311 *N.J.Super.* 587, 589, 710 *A.2d* 1035 (App.Div.1998). The panel also focused on the phrase "certain judicial costs." *See ibid.* Because the capital costs necessary for the construction, renovation or expansion of court facilities were not mentioned in the definitions of "judicial costs" or "judicial facility costs," the Appellate Division determined that the State's "only affirmative obligation" is to provide facilities for the Supreme Court, the Appellate Division, and the Chancery Division other than the Family Part, pursuant to *N.J.S.A.* 2B:6–1a. *Ibid.*

Morris, Camden and Bergen Counties filed petitions for certification, which we granted on September 11, 1998. 156 *N.J.* 405, 719 *A.2d* 637.

## II

It is helpful to first place the amendment in its historical context by examining the events leading up to SCR–58. Over the past three decades, the New Jersey trial courts have gradually moved from a county- to a state-based system. The Judicial Article of the New Jersey Constitution of 1947 specifically provided for county courts. *N.J. Const.* art. VI, § I, ¶ 1 (stating that "[t]he judicial power shall be vested in a Supreme Court, a Superior Court, County Courts and inferior courts of limited jurisdiction") (amended in 1978 to omit reference to "County Courts"). These courts were historically funded at the local level. In 1978 and 1983, the voters approved two constitutional amendments and took a giant step toward unification of the State Judiciary. The 1978

---

[2] Warren County was permitted to participate as *amicus curiae* in the Appellate Division.

amendment abolished the County Courts and transferred the County Court judges to the State Superior Court system. *See Assembly Concurrent Resolution No. 38* (filed July 25, 1978). The 1983 amendment transferred the County District Court judges and the County Juvenile and Domestic Relations Court judges to the Superior Court system by abolishing the County District Courts, and by replacing the County Juvenile and Domestic Relations Court with the Family Part of the Chancery Division. *See Assembly Concurrent Resolution No. 84* (filed Feb. 10, 1983). As a result, the State assumed responsibility for the salaries of all state judges.

Although there were no longer any county courts or county judges, the trial court system continued to be primarily staffed by county employees and funded by county governments. Judicial costs were allocated as follows: the counties bore the costs of providing the salaries of judicial personnel, resources and supplies, and facilities for the Law Division and the Family Part; the State was responsible for the other parts of the Superior Court and the Supreme Court. *See Law Revision Commission Comment to N.J.S.A. 2B:5-1.* The counties financed expenditures for judicial services through property taxes, but competing demands for monies raised locally adversely affected the courts. Moreover, the 1976 "CAP" law generally prohibited property tax increases in excess of five percent of the previous year's tax levy. *See N.J.S.A.* 40A:4-45.4. Most important, significant disparities existed among the counties' property tax bases resulting in varying levels of support for the courts and seriously affecting the provision of uniform, quality judicial services across the State. Under multi-county funding it was not possible to unify management structures or equalize the allocation of resources throughout the judicial system.

In an effort to address these concerns even before the 1983 amendment, Chief Justice Wilentz created the Supreme Court Committee on Efficiency in the Operations of the Courts of New Jersey. The Committee was established in 1980 and presented its

final report in May 1982. *Final Report of the Supreme Court Committee on Efficiency in the Operations of the Courts of New Jersey* (1982) (*Efficiency Committee Report*). In its report, the Committee described the New Jersey trial court system as fragmented, lacking "single, centralized control over the allocation or use of court resources." *Id.* at iv. The Committee recommended state financing of the trial courts to "allow the Chief Justice to allocate resources throughout the total system according to priorities set by the Judiciary." *Id.* at 117.

Five years later, in July 1987, the State of New Jersey County and Municipal Government Study Commission submitted its own comprehensive report also recommending administrative and financial unification of the state trial court system. State of New Jersey County and Municipal Government Study Commission, *Judicial Unification* (July 1987). The Commission advised that "all of the county operating costs except those of the county clerks and the surrogates [should] be transferred to the State in the first year of the program, and that the counties [should] pay to the State in successive years a constantly declining share of the costs of financing the Trial Court System." *Id.* at 63. Capital and maintenance expenses were specifically addressed by a recommendation that those "costs be paid by the State to the counties." *Id.* at 58. It was thought that state funding of the trial court system would afford property tax relief, improve the quality of judicial services through the elimination of staffing disparities, and reduce court costs, over time, by means of the consolidation of administrative responsibilities. *Id.* at 65.

The Legislature incorporated many of the Commission's recommendations into SCR–58.

### III

"'The polestar of constitutional construction is always the intent and purpose of the particular provision.'" *State v. Apportionment Comm'n,* 125 *N.J.* 375, 382, 593 *A.*2d 710 (1991) (quoting *Gormley v. Lan,* 88 *N.J.* 26, 37, 438 *A.*2d 519 (1981)). We seek in construing the language of our Constitution "to give effect

to the intent of the people in adopting it." *Gangemi v. Berry,* 25 *N.J.* 1, 10, 134 *A.*2d 1 (1957). This means that, generally, where the language is unambiguous or unequivocal, the words of a constitutional provision should be given their plain meaning. *Ibid.* Where the text is unclear or ambiguous, however, a court may look to sources beyond the Constitution itself to ascertain the fundamental purpose underlying the language. *Lloyd v. Vermeulen,* 22 *N.J.* 200, 206, 125 *A.*2d 393 (1956). Moreover, even when the words appear to be clear and unambiguous, if the " 'true sense and meaning of the language used' " suggests a different meaning, that meaning will prevail. *Apportionment Comm'n, supra,* 125 *N.J.* at 381–82, 593 *A.*2d 710 (quoting *Lloyd, supra,* 22 *N.J.* at 206, 125 *A.*2d 393).

We begin our analysis by turning to the plain language of the 1992 amendment. The amendment requires the State to assume "certain" judicial costs, *N.J. Const.* art. VI, § VIII, ¶ 1a(1), but not all judicial costs. Immediately we find ambiguity, which lies in the uncertain identity of those "certain" judicial costs. The amendment provides a nonexclusive list of costs, including "salaries, health benefits and pension payments of all judicial employees, juror fees and library material costs," *id.* ¶ 1b(3), that are to be covered by the State. As Judge Stanton recognized, however, the definition of "judicial costs" is "not … airtight," *Board of Chosen Freeholders, supra,* 311 *N.J.Super.* at 643, 710 *A.*2d 1060 (Law Div.), because the expansive language "including, but not limited to" indicates that other items may be includable, even though not specifically enumerated in the statute. Nonetheless, the definition provides "some meaningful indication of what is included." *Ibid.* Under the *ejusdem generis* principle of statutory construction, when specific words follow more general words in a statutory enumeration, we can consider what additional items might also be included by asking whether those items are similar to those enumerated. *See* 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.17 (5th ed.1992). Applying this principle, the general term "judicial costs" would be limited to costs similar in nature to "salaries, health benefits and pension

payments of all judicial employees, juror fees and library material costs." *N.J. Const.* art. VI, § VIII, ¶ 1b(3). The type of items enumerated in the "judicial costs" definition suggests that the Legislature intended to shift costs associated with judicial personnel and supplies to the State, and not the capital costs of judicial facilities.

As noted earlier, the amendment also explicitly excludes "judicial facility costs," defined as "any costs borne by the counties prior to July 1, 1993 with regard to the operation and maintenance of facilities used by the courts or judicial employees," from the definition of "judicial costs." *Id.* ¶ 1b(1), (3). The definition of excluded "judicial facility costs" does not refer to the capital costs of constructing court facilities. The question therefore arises whether the capital costs of constructing, expanding and renovating court facilities qualify as "judicial facility costs" and are therefore not the State's responsibility.

■ The Counties assert that, because the Legislature failed to explicitly exclude "capital costs" from the definition of "judicial costs," the fiscal responsibility for those costs shifts to the State.[3] We disagree. Although capital costs may be considered distinct from operating and maintenance costs, and thus not covered by the "judicial facility costs" exclusion, we must still determine whether the Legislature intended to include capital costs in those "certain" judicial costs that the State is to assume, despite the

---

[3] Bergen County offers an additional argument in support of state assumption of capital costs. The courthouse in Bergen County, like that in Morris County, is classified as a historic structure, and as such, is subject to stricter and costlier construction controls. For example, counties with historic courthouses must retain a certified architect in historical structures and obtain state approval prior to making any improvements. Bergen County believes that when the State mandates expensive capital improvements because of the historic status of a courthouse, the State should bear the costs.

The Department of Environmental Protection, through the New Jersey Register of Historic Places Act, *N.J.S.A.* 13:1B–15.128 to 15.132, regulates the preservation of historic sites. This regulatory system is not related to judicial funding issues.

absence of an explicit reference to capital costs in the amendment. Courts may supply terms omitted by the Legislature only where it is abundantly clear that the addition is necessary to manifest the Legislature's intent. *Klink v. Township Council,* 181 *N.J.Super.* 25, 30, 436 *A.*2d 545 (App.Div.1981). As discussed below, *infra* at 579–83, 732 *A.*2d at 1061–63, nothing in the legislative history or other extrinsic sources suggests that the Legislature intended that the State finance the capital costs of judicial facilities.

The parties also dispute the relevance of the "July 1, 1993" date in the definition of "judicial facility costs." The Counties argue that they retain financial responsibility for judicial facilities that existed on July 1, 1993, except when renovation or expansion is required.[4] In contrast, the State contends that the date was intended merely to signify the types of costs for which the counties remain responsible under *N.J.S.A.* 2B:6–1b, *i.e.,* the judicial facility costs of the Law Division and the Family Part. The Counties answer that the State's interpretation "would render the reference to July 1, 1993 inoperative." In the Counties' view, the Legislature's decision to employ the language "any costs," rather than "*types* of costs," implies that the Legislature meant costs, not types of costs.

Judge Stanton concluded that July 1, 1993, "was used to indicate the type of costs borne by the counties, and was not meant to identify on a perpetual basis any actual facilities." *Board of Chosen Freeholders, supra,* 311 *N.J.Super.* at 648, 710 *A.*2d 1060 (Law Div.). We find Judge Stanton's analysis most persuasive

---

[4] In support of this interpretation, the Counties rely upon a fiscal estimate to SCR–58 prepared by the Office of Legislative Services on July 16, 1992, stating that "[t]he operational and maintenance costs of ... [judicial] facilities created after July 1, 1993 would be a State fiscal responsibility." *Legislative Fiscal Estimate to Senate Concurrent Resolution No. 58* (July 16, 1992). We agree with Judge Stanton that because the fiscal estimate was prepared 18 days after SCR– 58 was enacted, it provides no assistance in discerning legislative intent. *See Board of Chosen Freeholders, supra,* 311 *N.J.Super.* at 645, 710 *A.*2d 1060 (Law Div.).

and concur that the most sensible reading of the July 1, 1993 date is that the counties will retain responsibility for providing court facilities for the Law Division and the Family Part, consistent with *N.J.S.A.* 2B:6–1b.

## IV

Recognizing that "words are inexact tools at best," we have stated that in construing constitutional provisions, "resort may freely be had to the pertinent constitutional and legislative history for aid in ascertaining the true sense and meaning of the language used." *Lloyd, supra,* 22 *N.J.* at 206, 125 *A.*2d 393; *see also Atlantic City Racing Ass'n v. Attorney General,* 98 *N.J.* 535, 542, 489 *A.*2d 165 (1985); *New Jersey Pharm. Ass'n v. Furman,* 33 *N.J.* 121, 130, 162 *A.*2d 839 (1960). One piece of legislative history discussing the amendment is the Committee Statement included with the revision to SCR–58. The Statement explained that the "judicial facility costs" exclusion was designed to "clarify that costs presently borne by the counties with regard to the operation and maintenance of facilities used by the courts and probation departments would not be assumed by the State." Senate Judiciary Comm., *Statement to Senate Concurrent Resolution No. 58,* at 1 (June 8, 1992). Judge Stanton observed that capital costs are simply not mentioned. *Board of Chosen Freeholders, supra,* 311 *N.J.Super.* at 645, 710 *A.*2d 1060 (Law Div.). For that reason, the Statement provides no evidence that the Legislature intended state assumption of the capital costs of judicial facilities under the amendment.

That the Legislature intended to shift only the costs associated with judicial personnel and supplies to the State is supported by earlier studies of this issue. As far back as May 1982, the Supreme Court Committee on Efficiency in the Operations of the Courts of New Jersey recommended state financing of the trial courts to "allow the Chief Justice to allocate resources throughout the total system according to priorities set by the Judiciary." *Efficiency Committee Report, supra,* at 117. Five years later, the State of New Jersey County and Municipal Government Study

Commission recommended that all of the operating costs of the courts should be assumed by the State. *Judicial Unification, supra,* at 63. The Commission also said that the State should assume capital and maintenance expenses, *id.* at 58, at the same time noting that few states financed those expenses, *id.* at 4. Indeed, as of 1987, only six states were responsible for the costs of capital and maintenance, and four of those states either did not have county governments or had never provided for county-governed courts. *Id.* at 58. The assumption of capital and maintenance costs, in the view of the Commission, is

> the most complex form of assumption, and it is also very costly to the state. It involves facility surveys to determine the relationship between space occupied by the courts and space occupied by other agencies, the divergent need for improvement or expansion of facilities in each of the counties, and endless negotiations with local governments and state officials as to the "best" way to accomplish the transfer.

[*Id.* at 4.]

In drafting SCR–58, the Legislature adopted the Commission's recommendation in respect of personnel and supplies, that is, full state support for those costs. The Legislature's exclusion of the word "capital" from the list of enumerated judicial costs to be assumed by the State, however, can be understood only as a rejection of the capital costs recommendation in the Commission's report.

More recently, the Statements of Chief Justice Wilentz and the NJSBA at the public hearing on SCR–58 were directed at the benefits to be derived from state assumption of the costs associated with personnel and supplies. We again find significant the lack of any discussion about capital costs, especially because of the large amounts involved in financing capital construction. Such costs would have been a critical component of the proposed amendment, both to the Legislature and to the public.

## V

In addition to legislative history, we have considered statutory enactments that were adopted at about the same time as the

constitutional provision at issue in order to determine the purpose and intent of the provision. *Atlantic City Racing Ass'n, supra,* 98 *N.J.* at 548, 489 *A.*2d 165; *New Jersey Pharm. Ass'n, supra,* 33 *N.J.* at 130, 162 *A.*2d 839; *Lloyd, supra,* 22 *N.J.* at 210, 125 *A.*2d 393. Where a constitutional term is ambiguous, contemporaneous legislative understanding may be helpful in discovering the meaning of that term. *Lloyd, supra,* 22 *N.J.* at 210, 125 *A.*2d 393.

Contemporaneous legislation supports our conclusion that capital costs did not shift from the counties to the State under the amendment. The State Judicial Unification Act, *N.J.S.A.* 2B:10–1 to –9, ("Unification Act"), enacted on December 6, 1993 to implement the amendment, requires the State to assume "judicial costs" by January 1, 1995, *N.J.S.A.* 2B:10–4a. The Unification Act defines "judicial costs" as "the costs incurred by the county for funding the judicial system, including but not limited to the following: salaries, health benefits and pension costs of all judicial employees, juror fees, library material costs, and centrally-budgeted items such as printing, supplies, and mail services." *N.J.S.A.* 2B:10–3c. *N.J.S.A.* 2B:10–7a, in turn, provides that each county and the State should jointly develop a list of "the furnishings and office equipment currently used by the courts which shall become the property of the State on January 1, 1995." The Legislature once again did not include judicial facility costs within the State's assigned costs although the furnishings and office equipment that shifted to state ownership were specifically mentioned.

As Judge Stanton observed, although the Unification Act mandated that the State assume responsibility for furnishings, office equipment and supplies used by the court system, the Act was "totally silent" concerning which entity, the State or each county, was to provide courtrooms, chambers, and other facilities for all the courts.[5] *Board of Chosen Freeholders, supra,* 311 *N.J.Super.*

---

[5] The only reference to facility costs in the Unification Act is found at *N.J.S.A.* 2B:10–7c(1)(f), which requires the counties to report to the Administrative Office

at 649, 710 *A*.2d 1060 (Law Div.). The silence of the Legislature can be read only as an exclusion. To suggest otherwise would result in the allocation of a substantial fiscal responsibility to the State without any explicit declaration of an intent to do so.

 Finally, questions put to the voters must be accompanied by an interpretive statement that serves as an aid to understanding the matter under consideration. *See N.J.S.A.* 19:3–6 (mandating "brief statement interpreting the . . . [constitutional amendment] and setting forth the true purpose of the matter being voted upon"); *see also Gormley v. Lan,* 88 *N.J.* 26, 37, 438 *A*.2d 519 (1981) (stating interpretative statement is designed to "help the voter understand more about the amendment than the public question tells him, for the purpose of aiding him in his decision"). The interpretative statement should "get to the heart of the matter as understood by those who are knowledgeable about it." *Gormley, supra,* 88 *N.J.* at 37, 438 *A*.2d 519. Put another way, the interpretive statement should always be informative and fair. *Id.* at 37–38, 438 *A*.2d 519; *Kimmelman v. Burgio,* 204 *N.J.Super.* 44, 53, 497 *A*.2d 890 (App.Div.1985); *see also Guernsey v. Allan,* 63 *N.J.Super.* 270, 275, 164 *A*.2d 496 (App.Div.1960) (striking interpretative statement from ballot because language used "exceeded the limits of propriety" by "advising the voter on the face of the ballot to cast an affirmative vote").

 Consistent with what we have observed throughout our discussion of the language and the legislative history of the amendment, the allocation of capital costs was not mentioned in the statement provided to the voters in the November 1992 election. If the Legislature intended to shift entire responsibility

---

of the Courts "plans for all facilities and construction and age information on the facilities required by the companies currently insuring the contents"—a provision relating to insurance coverage, rather than the allocation of judicial facility costs. *N.J.S.A.* 2B:10–7b(1)(b) addresses service agreements relating to "debt service or lease payments for furnishings and office equipment." If agreements concerning facilities were involved, we presume the Legislature would have mentioned facilities.

for the capital costs of constructing judicial facilities to the State, we would expect that that information would have been conveyed to the voters in the interpretative statement. It was not. In construing a constitutional provision, courts should "inquire as to the meaning the symbols of expression would most naturally and plainly convey, the sense most obvious to the common understanding ... [for][t]he Constitution was written 'to be understood by the voters.'" *Gangemi, supra,* 25 *N.J.* at 16, 134 *A.*2d 1 (quoting *United States v. Sprague,* 282 *U.S.* 716, 731, 51 *S.Ct.* 220, 222, 75 *L.Ed.* 640, 644 (1931)). An ordinary voter presented with the interpretative statement would not understand the amendment to shift the capital costs of judicial facilities to the State.

## VI

We hold that Article VI, Section VIII, Paragraph 1 of the New Jersey Constitution does not require the State to assume the capital costs of judicial facilities.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.