768 A.2d 262

CITY OF NORTH WILDWOOD, PLAINTIFF, v. NORTH WILDWOOD TAXPAYERS' ASSOCIATION, JOHN J. FARMER, JR., ANGELA PULVINO, THE CAPE MAY COUNTY BOARD OF ELECTIONS, DEFENDANTS.

Superior Court of New Jersey
Law Division Cape May County

Decided September 27, 2000.

*William J. Kaufmann* for plaintiff, (Cafiero & Balliette).

*John Porto* for defendant Angela Pulvino.

*Marcus H. Karavan* for defendant North Wildwood Taxpayers' Association.

WINKELSTEIN, A.J.S.C.

Plaintiff filed a complaint for declaratory relief asking the court to set a date for an election to change the form of government for the City of North Wildwood (the City) and to determine whether an interpretive statement could accompany the ballot question. The matter was heard on an emergent basis on September 14, 2000 at which time I made the following findings: (1) The question concerning adoption of a new form of government for the City shall be placed on the November 7, 2000 ballot; (2) An interpretive statement may accompany the question; (3) The form of interpretive statement adopted by the City governing body at its meeting on September 2, 2000 was stricken as it would not aid the voters in understanding the ballot question. This opinion is a more detailed explanation of the reasons for my decision.[1]

On August 21, 2000, the North Wildwood Taxpayers' Association (the Taxpayers' Association) petitioned the City Clerk (the Clerk) to schedule an election to permit a public vote on a question changing the City's present mayor-council form of government to a commission form of government. The Taxpayers' Association presented the Clerk with a list of signatures, and requested that the following question be placed on the ballot: "Shall the CITY OF NORTH WILDWOOD, NEW JERSEY abandon its present form of government and adopt the COMMISSION FORM OF GOVERNMENT as provided by N.J.S. 40:72–1, et seq?"

Upon receipt of the petition, the Clerk verified the authenticity of the signatures and determined that the petition was signed by the statutorily required number of qualified voters. On September 5, 2000 the City's governing body adopted a resolution authorizing the Clerk to include the question proposing a change in the

---

[1] An issue concerning the obligation of the City Clerk to provide notices for the election was also raised and decided but is not addressed in this opinion.

form of government from a mayor-council form of government to a commission form of government on the November 7, 2000 general election ballot. The resolution also authorized that an interpretative statement be included to clarify the question. The original interpretive statement proposed by the governing body was as follows:

Passage of this question will change the form of government under which North Wildwood has operated for 90 years, to the commission form of government under which the City of Wildwood has operated for 6 as one of only 32 (down from over 60 in 1920) such municipalities of the 566 throughout the state. Our existing governing body and all other boards and bodies existing in the City, except the Board of Education and the Municipal Court, shall be abolished. The terms of the Mayor, all Councilmen and all other Officers, whether elected or appointed, shall immediately be terminated. All powers and duties of such boards shall pass to a new Board of Commissioners, to be elected at a special election to be held within 5 weeks.

After an initial management conference with the court, the City changed the language of the interpretive statement, deleting the reference to the City of Wildwood. The revised statement reads:

Passage of this question will change the form of government under which North Wildwood has operated for 90 years, to the commission form of government, a form under which only 32 municipalities (down from over 60 in 1920) of the 566 throughout the state are governed. Our existing governing body and all other boards and bodies existing in the City, except the Board of Education and the Municipal Court, shall be abolished. The terms of the Mayor, all Councilmen and all other Officers, whether elected or appointed, shall immediately be terminated. All powers and duties of such boards shall pass to a new three member Board of Commissioners, to be elected, at large, at a special election to be held within 5 weeks.

I. The Issues

The Walsh Act, which includes the commission form of government, requires the Clerk to call an election on the third Tuesday after the petition is filed. *N.J.S.A* 40:71–2. This time frame conflicts with the notice provisions of the Absentee Voting Law, *N.J.S.A.* 19:57–1, 57–40, which require that military and civilian absentee voters be given notice of the proposed question fifty days prior to the election. *N.J.S.A.* 19:57–7. Plaintiff claims that to prevent the disenfranchisement of military and civilian absentee voters the notice provision in the Walsh Act, which only allows a

few weeks between the filing of the petition and the election, must yield to the notice provision in the Absentee Voting law.

Plaintiff also submits that if the notice provisions of the Absentee Voting Law are strictly applied, using the first Tuesday after the expiration of 50 days from the date the petition was filed, a special election would be held during the month of October, less than thirty days prior to the date of the November 7, 2000 general election, which would cost the City more than $16,000, whereas the bulk of those election expenditures could be saved if the question is presented to the voters at the time of the general election.

Next, plaintiff argues that the form of public question is unclear and does not fully inform the voters of the nature of the question being voted upon. As a result, plaintiff requests an interpretive statement be permitted to accompany the question on the ballot. This becomes an issue since neither *N.J.S.A.* 40:71–3, which provides for the form and content of the ballot, nor any other provision of the Walsh Act, authorizes inclusion of an interpretive statement on the ballot. However, the general election laws, specifically *N.J.S.A.* 19:3–6, authorizes the inclusion of an interpretive statement if a question is not clearly set forth. The Taxpayers' Association has questioned both the need for an interpretive statement in this instance and the wording of the interpretive statement, should the court determine one is warranted.

## II. The Date of the Election

■ Voters may petition the Clerk to change the form of government from a mayor-council form pursuant to the Faulkner Act, *N.J.S.A.* 40:69A–1 to :69A–17, to a commission form of government under the Walsh Act. *N.J.S.A.* 40:70–1 to :96–27. If the voters of a municipality propose to change their form of government to a commission form of government, they must follow the provisions of *N.J.S.A.* 40:71–1.

The legal voters of any municipality not governed by chapters 70 to 76 of this title (§ 40:70–1 et seq.) may adopt said chapters at an election held in such municipality, to be called by the municipal clerk upon request or petition in writing of twenty per

cent of the persons qualified to vote at the last general election as shown by the registry of qualified voters used at such election.

*N.J.S.A.* 40:71–1 does not specify a time period within which the clerk has to verify whether the persons are qualified to vote.

*N.J.S.A.* 40:71–2 provides that:

Upon the filing of the petition or request in writing with the clerk, he *shall forthwith call an election, to be held on the third Tuesday following the date of filing of the petition,* and shall cause public notice of the time and place of holding the same to be given by advertisement signed by himself and set up in at least twenty different places in the municipality and published for at least six days previous to the time of the election in at least one newspaper printed and published in the municipality, and if there be no such newspaper then in a newspaper circulated therein. (emphasis added)

The time frame for scheduling the election provided in *N.J.S.A.* 40:71–2 conflicts with the time within which to notify military and civilian absentee voters under the Absentee Voting Law, *N.J.S.A.* 19:57–7, which states that the clerk of the municipality, in the case of any municipal election, shall publish notice to military service voters and persons desiring civilian absentee ballots, and that "[s]uch notices shall be separately published prior to the 50th day immediately preceding the holding of any election." The law providing for absentee voters is to be liberally construed to allow the greatest number of registered voters as possible the opportunity to vote. *N.J.S.A.* 19:57–3.

The New Jersey Supreme Court, in *Steger v. Schellenger,* 33 *N.J.* 293, 163 *A.2d* 377 (1960), was asked to determine whether the Absentee Voting Law rendered the Walsh Act provisions, which at that time required the special election to be held on the fourth Tuesday following the date of the filing of the petition with the municipal clerk, inoperative. *Id.* at 296, 163 *A.2d* 377, (*citing R.S.* 40:80–2). The Court held that "the statutes may easily be reconciled by delaying the election to the first Tuesday after the expiration of the 40–day period, which indeed was the course the municipal clerk here took in fixing August 9 as the date for the election." *Id.* at 296–97, 163 *A.2d* 377. The Court further stated that "[t]here surely is no expressed evidence of a legislative purpose to prevent an election; rather the purpose was to permit

fuller participation in it. This construction gives effect to the legislative policies in both statutes." *Id.* at 297, 163 *A.*2d 377.

In this case, on August 21, 2000, the Clerk was tendered a petition to conduct an election to adopt a commission form of government. The Clerk then conducted the appropriate investigation and determined that the statutorily prescribed number of voters was met. On September 5, 2000, the City's governing body adopted a resolution scheduling the election for November 7, 2000. I find the City's action when it scheduled the election for November 7 was appropriate. Holding the election on Tuesday, September 5, 2000, the third Tuesday following the filing of the petition, instead of on November 7, 2000, the date of the general election, would have disenfranchised absentee voters. They would not have received sufficient notice to allow them to request and submit absentee ballots, contrary to the expressed intent of the act, which is to be liberally construed. On the other hand, while complying with the restrictive time frames of the Walsh Act will limit the number of potential voters, delaying the election to conform to the notice requirements of the Absentee Voting Law to the date of the general election will give absentee voters adequate time to request and submit their ballots, and will probably result in a larger voter turn-out since the offices of both President of the United States and United States Senator are on the ballot. The delay would foster, rather than impede, the legislature's stated goal of providing the greatest number of registered voters as possible the opportunity to vote. *N.J.S.A.* 19:57–3. It would also be cost effective. The costs for the general election will subsume, to a significant extent, the costs of putting the change of government question on the ballot. The City estimates it will save approximately $16,000. Although cost should not be a controlling factor, such a savings to the taxpayers should not be ignored. Therefore, I find that the question proposing a change in the form of government may be placed on the November general election ballot. This will give the Clerk an opportunity to publish the statutory notice to absentee voters.

III. Interpretive Statement

The Resolution adopted by the governing body at its September 5, 2000 meeting includes an interpretive statement. An interpretive statement is designed to help voters understand the matter to be voted. *See Gormley v. Lan,* 88 *N.J.* 26, 37, 438 *A.*2d 519 (1981) (*citing Great Northern R. Co. v. Flaten,* 225 *N.W.*2d 75, 78 (N.D.Sup.Ct.1974)) (stating that when a public question does not indicate to the voter what is involved, an interpretive statement is appropriate because the voter must be informed as to the choice he or she is voting upon). Although the Walsh Act does not include a provision that allows an interpretive statement to accompany the change of form of government question on a ballot, neither does the Walsh Act prohibit one. The general election statutes, *N.J.S.A.* 19:1–1 to:11–1, particularly *N.J.S.A.* 19:3–6, provides that:

Any public question voted upon at an election shall be presented in simple language that can be easily understood by the voter. The printed phrasing of said question on the ballots shall clearly set forth the true purpose of the matter being voted upon . . In event that in any statute the public question to be voted upon is so stated as not clearly to set forth the true purpose of the matter being voted upon and no provision is made in said statute for presenting the same in simple language or printing upon the ballots a brief statement interpreting the same, there may be added on the ballots to be used in voting upon the question, a brief statement interpreting the same and setting forth the true purpose of the matter being voted upon in addition to the statement of the public question required by the statute itself.

Election law statutes and the provisions of the Faulkner Act and Walsh Act are to be read *in pari materia. Seligson v. De Bruin,* 174 *N.J.Super.* 60, 69, 415 *A.*2d 375 (Law Div.1980). *N.J.S.A.* 19:1–2 states that the general election laws apply to elections held in municipalities in so far as the provisions of Title 19 are not inconsistent with the Walsh Act. Allowing an interpretive statement will not be inconsistent with the Walsh Act, since it does not prohibit such a statement. An interpretive statement is permissible if the question is vague or unclear.

The question that will be asked is "Shall the CITY OF NORTH WILDWOOD, NEW JERSEY abandon its present form

of government and adopt the COMMISSION FORM OF GOVERNMENT as provided by N.J.S. 40:72–1, et seq?" I find the language unclear. The statutory reference will make little sense to someone not versed in the law. The question does not explain to the voter the consequences of a "yes" or "no" vote. Therefore, an interpretive statement may accompany the question on the ballot. The next question, then, is whether the proposed interpretive statement is properly worded.

 The interpretive statement should be brief and written in a manner that aids the voter in making his or her decision. *Board Chosen Freeholders v. State,* 159 *N.J.* 565, 582, 732 *A.*2d 1053 (1999). *See Gormley,* 88 *N.J.* at 37, 438 *A.*2d 519, (stating that an interpretative statements is designed to help the voter understand more about the amendment than disclosed in the public question for the purpose of aiding the voter in his/her decision). The "interpretive statement should always be informative and fair." *Board of Chosen Freeholders v. State, supra,* 159 *N.J.* at 582, 732 *A.*2d 1053 (*citing Gormley,* 88 *N.J.* at 37, 438 *A.*2d 519). Thus, it must be decided if the language proposed in the interpretive statement is fair and fulfills its explanatory purpose; in other words, will it aid the voters in understanding the question.

In *Guernsey v. Allan,* 63 *N.J.Super.* 270, 164 *A.*2d 496 (App.Div. 1960), the court was presented with an appeal from a summary judgment decision amending an interpretive statement proposed by a charter commission. The proposed language was:

A vote of Yes will give Waldwick a modern form of government, with a council of five members elected by the people and a full time, qualified borough manager appointed by the council and accountable to it, and subject to removal by the council. A vote of No will keep the present borough form of government.

[*Id.* at 274, 164 *A.*2d 496.]

It was alleged that the statement exceeded its interpretive bounds, and was "argumentative" and tended to " 'induce the voter to cast an affirmative vote on the question presented.' " *Id.* The *Guern-*

*sey* court agreed that the statement exceeded its interpretive bounds by implicitly advising the voter to cast an affirmative vote.

 In the case before me the revised proposed statement says:

Passage of this question will change the form of government under which North Wildwood has operated for 90 years, to the commission form of government, a form under which only 32 municipalities (down from over 60 in 1920) of the 566 throughout the state are governed. Our existing governing body and all other boards and bodies existing in the City, except the Board of Education and the Municipal Court, shall be abolished. The terms of the Mayor, all Councilmen and all other Officers, whether elected or appointed, shall immediately be terminated. All powers and duties of such boards shall pass to a new three member Board of Commissioners, to be elected, at large, at a special election to be held within 5 weeks.

I find that the statement as written exceeds the bounds of being merely explanatory by including language that is prejudicial and misleading, and places the proposed form of government in an unfavorable light. The language, when read sentence by sentence or as a whole, will not aid the voters; it not only fails to make the question more clear, but it raises certain improper inferences. Specifically, the improper language reads as follows:

(1) "[U]nder which North Wildwood has operated for 90 years..." The statement implies that if the form of government has been the same for so long, it must be working. A fair reading would encourage the voters to vote "no".

(2) "... a form under which only 32 municipalities (down from over 60 in 1920) of the 566 throughout the State are governed." The statement implies that the commission form of government should be viewed in an unfavorable light since it is now used less often than it has been in the past. The language suggests a "no" vote.

(3) Our existing governing body and all other boards and bodies existing in the City, except the Board of Education and the Municipal Court, shall be abolished. The terms of the Mayor, all Councilmen and all other Officers, whether elected or appointed, shall immediately be terminated. All powers and duties of such boards shall pass to a new three member Board of Commissioners, to be elected, at large, at a special election to be held within 5 weeks.

The statements are misleading. One could infer that if the form of government is changed the City would be without a government for some period of time. It could also be inferred that the duties of the board of education and the municipal courts would pass to the new board of commissioners. The language will not aid the

voters in understanding the question. It is neither informative, nor fair.

For all of these reasons the interpretive statement shall be deleted. Since the language allowing the interpretive statement in the general election laws is permissive, rather than mandatory, *N.J.S.A.* 19:3–6, the City governing body need not include a new interpretive statement. Should the City decide to prepare a new statement, before adoption it shall first allow the Taxpayers' Association an opportunity for review. Should there be an objection to the new language the court shall hear argument at that time.