924 A.2d 447

GALLENTHIN REALTY DEVELOPMENT, INC., A NEW JERSEY CORPORATION AND/OR GEORGE A. AND CYNTHIA L. GALLENTHIN III, H/W, BOTH JOINTLY AND SEVERALLY, PLAINTIFFS–APPELLANTS, v. BOROUGH OF PAULSBORO, A NEW JERSEY MUNICIPALITY AND/OR PLANNING BOARD OF BOROUGH OF PAULSBORO AND/OR PAULSBORO REDEVELOPMENT AGENCY, JOINTLY AND SEVERALLY, DEFENDANTS–RESPONDENTS.

Argued April 26, 2007—Decided June 13, 2007.

*Peter D. Dickson,* argued the cause for appellants (*Potter and Dickson,* attorneys; *Mr. Dickson* and *R. William Potter,* on the briefs).

*M. James Maley, Jr.,* argued the cause for respondents (*Maley & Associates,* attorneys; *Mr. Maley, Elizabeth L. Bancroft, Emily K. Givens, Joseph F. Kunicki,* and *Erin E. Simone,* on the briefs).

*Ronald K. Chen,* Public Advocate, argued the cause for amicus curiae Public Advocate of New Jersey (*Mr. Chen,* attorney; *Mr. Chen, Brian Weeks,* Deputy Public Advocate, *Alexander D. Gladney,* Assistant Deputy Public Advocate and *Catherine Weiss,* Director, Division of Public Interest Advocacy, of counsel and on the brief).

*Robert S. Goldsmith,* argued the cause for amici curiae New Jersey State League of Municipalities, Downtown New Jersey, Inc. and New Jersey Chapter–American Planning Association (*Greenbaum, Rowe, Smith and Davis,* attorneys; *Robert Beckelman,* on the brief).

*Carter H. Strickland, Jr.,* Staff Attorney, Rutgers Environmental Law Clinic, submitted a brief on behalf of amici curiae New Jersey Audubon Society and New Jersey Conservation Foundation.

*Kenneth E. Meiser,* submitted a brief on behalf of amicus curiae New Jersey Builders Association (*Hill Wallack,* attorneys; *Mr. Meiser* and *Anne L.H. Studholme,* on the brief).

*Peter H. Wegener,* submitted a brief on behalf of amicus curiae Institute For Justice (*Bathgate, Wegener & Wolf,* attorneys; *Mr. Wegener* and *Jeff Rowes,* a member of the New York bar, on the brief).

Chief Justice ZAZZALI delivered the opinion of the Court.

Gallenthin Realty Development, Inc. owns a sixty-three-acre parcel of largely vacant wetlands in the Borough of Paulsboro. In 2003, Paulsboro classified the Gallenthin property as "in need of redevelopment" under *N.J.S.A.* 40A:12A–5(e) because the property's unimproved condition rendered it "not fully productive." Such a classification subjects property to taking by eminent domain. *N.J.S.A.* 40A:12A–8(c). The trial court and Appellate Division upheld Paulsboro's redevelopment designation.

Because the New Jersey Constitution authorizes government redevelopment of only "blighted areas," we conclude that the Legislature did not intend *N.J.S.A.* 40A:12A–5(e) to apply in circumstances where the sole basis for redevelopment is that the property is "not fully productive." We therefore invalidate Paulsboro's redevelopment classification concerning the Gallenthin property and hold that *N.J.S.A.* 40A:12A–5(e) applies only to areas that, as a whole, are stagnant and unproductive because of issues of title, diversity of ownership, or other similar conditions.

## I.

### A.

Although the Gallenthin family has owned the parcel at issue since 1951, the family had enjoyed the property as early as 1902, when it used the land to moor barges transporting produce from Mantua to Philadelphia. As it currently exists, the property is bounded on its western edge by Mantua Avenue, on its eastern edge by Mantua Creek, which flows into the Delaware River, and on its southern tip by an industrial facility, across from which is a residential section of Paulsboro. The property's northern edge abuts a packaging facility and an inactive British Petroleum (BP) storage site, which fronts the Delaware River across from the Philadelphia International Airport. Plaintiffs Gallenthin Realty Development, Inc. (Gallenthin), George A. Gallenthin, III, and Cindy Gallenthin own the property with clear, quieted title.

The land consists mostly of undeveloped open space and is identified as protected wetlands on the New Jersey Department of Environmental Protection's (DEP) Geographic Information System. There is also an unused railroad spur that traces the property's western edge, an active gas pipeline that bisects the property, and several mooring pylons designed to receive boats navigating Mantua Creek. At Gallenthin's request, the Paulsboro Planning Board rezoned the property in 1998 from manufacturing to marine industrial business park, thereby permitting various commercial, light industrial, and mixed non-residential uses.

The property historically has been used as a deposit site for dredging materials. In 1902, the property was authorized to receive dredge deposits from the United States Army Corps of Engineers, which was responsible for widening and straightening Mantua Creek. The Army Corps of Engineers made deposits on the Gallenthin property in 1902, 1934, 1937, and 1963. Although nearby waterways are not currently being dredged, plaintiffs contend that the property may still receive dredging deposits and that dredging is a "periodic" activity that occurs "every 35 years or so as the need arises." [1]

Other than the property's sporadic use as a dredging depot, Gallenthin leased portions of the property to an environmental clean-up organization, Clean Ventures, in 1997 and 1998. Clean Ventures used the property for river access, employee parking, and storage. Additionally, since 1997, a wild-growing reed, *phragmites australis* (phragmites), has been harvested from the Gallenthin property three times a year. The reed can be used as cattle feed and, according to plaintiffs, is recognized by the federal Environmental Protection Agency as a valuable plant species that actively neutralizes soil pollutants. Although the record does not reveal how much profit Gallenthin generates from harvesting the

---

[1] The Delaware River Port Authority recently took steps to reinstate dredging of the Delaware River. *See* Press Release, State of New Jersey Office of the Governor, Governor Corzine Announces Agreement to Allow DRPA to Resume Meeting (May 17, 2007).

phragmites, Paulsboro characterizes any revenue as negligible and primarily for tax abatement purposes.

In 1998, Paulsboro—a town of about 6,500 residents and covering approximately two square miles—adopted a new master plan. The plan referenced seven broadly defined areas of Paulsboro that should be redeveloped to stimulate the Borough's economic rehabilitation. Although the Gallenthin property was not included in the master plan's redevelopment recommendations, the plan mentioned the Gallenthin property, stating:

> The 63 acre Gallenthin property is idle and may be largely undeveloped due to tidal wetlands regulations. This Mantua Creek site may, however, be available for development as a boat launch or marina. . . . The Borough should explore acquiring the property and working with redevelopers and with the Nature Conservancy or other nature agency to assist in the development of a creek front marina with the bulk of the property used as a nature center for tidal river appreciation or passive recreation use.

In 1999, the Paulsboro governing body authorized the Planning Board to investigate whether several parcels, primarily the BP facility and an adjacent Dow/Essex Chemical (Dow) property, could be designated as "in need of redevelopment" pursuant "to the criteria set forth in *N.J.S.A.* 40A:12A–5." The governing body's resolution did not encompass the Gallenthin property. In June 2000, the governing body authorized the Planning Board to investigate additional, contiguous parcels, but the Gallenthin property was again not included.

The investigation reports, prepared by Remington & Vernick Engineers, Inc. (Remington & Vernick) and presented to Paulsboro in 2000, described the properties under review as

> land upon which are located a now closed liquid storage facility for petroleum products and an unimproved three (3) acre parcel, all of which being owned by BP Oil Company; contiguous unimproved parcels utilized for miscellaneous storage, owned by Norman B. Swindell; and now a closed chemical plant, owned by Dow Chemical Company.

Remington & Vernick concluded that "given primarily the closure of the facilities and the stagnant and not fully productive condition of the land, . . . the parcels comprising the study meet the statutory definition for an 'area in need of redevelopment.'" In

December 2002, Paulsboro adopted Remington & Vernick's recommendations and designated the implicated property as the "BP/Dow Redevelopment Area."

Also, in 2000, BP and Dow retained URS Corporation (URS) to conduct a two-phase "Site Redevelopment Study" of their combined facilities. The first phase of the URS study did not reference the Gallenthin property. However, the phase-two report, presented to BP and Dow in 2002, contained the first suggestion that the Gallenthin property be included in the BP/Dow redevelopment project. URS observed that "transportation to the [BP/Dow redevelopment] site is an issue" and proposed three alternative access routes. One proposed route involved a bridge over Mantua Creek connecting to an access road that would traverse a small portion of the Gallenthin property. URS expressly discouraged that option, however, because of "wetlands and ownership challenges." Rather, URS concluded that the most "natural alignment to the site" and the "preferred" access route involved a bridge to the north of the Gallenthin property that would directly enter the BP/Dow site.

Paulsboro then requested that its own engineers, Remington & Vernick, compile a "Redevelopment Plan Summarization" regarding the URS report. Presented in October 2002, the summarization noted that "[t]he URS Phase II Study indicates the possibility of ultimately including [in the redevelopment project] the [Gallenthin] parcel immediately to the south of the BP site. . . . In the event of said eventuality, a further preliminary investigation would be necessary as [that] parcel[ ] w[as] not previously examined." [2] Consequently, in December 2002, Paulsboro authorized Remington & Vernick to prepare a "Redevelopment Area Study and Plan" that, for the first time, included the Gallenthin property.

---

[2] Remington & Vernick's summarization also stated: "This Plan incorporates by reference the Strategic Overview, Primary Goals, and Recommendations enunciated in the URS Study," thus adding to the record before the Planning Board those aspects of the URS report.

That plan described the Gallenthin property as an "expanse of vacant unimproved land, other than for a rail line." Regarding the statutory criteria for classifying the property as "in need of redevelopment," the report stated:

Conditions rising to the level of the requisite criteria for a redevelopment declaration noted from field observation conducted in January 2003 include: a not fully productive condition of land as evidenced by the expanse of vacant unimproved parcels which otherwise could be beneficial in contributing to the public health, safety and welfare of the community resultant from aggregation of the positive features of development such as the introduction of new business, job creation, and enhanced tax base; and as further evidenced by the underutilization of the existing rail line (Criteria [N.J.S.A. 40A:12A–5(e)]).

Owing principally to the instances of stagnant and not fully productive condition of land and circumstance of rail line underutilization, this report concludes that existing conditions, as described herein, satisfy the statutory criteria necessary to deem the study area an area in need of redevelopment.

[(Internal heading omitted).]

The report made no reference to the URS proposal that the Gallenthin property be included because of access problems associated with the larger BP/Dow Redevelopment Area.

In April 2003, the Planning Board held a public hearing regarding the classification of the Gallenthin property as "in need of redevelopment." The Planning Board's professional planner, George Stevenson, presented the redevelopment plan and testified that the Gallenthin property should be included in the plan. Stevenson had previously conducted a physical inspection of the property and presented photographs of the property at the hearing. Commenting on the photographs, Stevenson testified:

[W]e find [a] condition that lends itself to economic deterioration. That is, you have no improvement; you have vacant unimproved conditions. There's just no activity, and I would suggest to the board that if there would be improvement upon those parcels, particularly if there would be improvement in conjunction with the plan that's been previously approved, the aggregate ... would be beneficial to the municipality in that there would be commerce occurring, there would be job creation resulting from that commerce occurring and the bottom line [is] it would certainly enhance the tax base for the municipality, and so I am able to state to the board that because we have vacant, unimproved conditions, because there's bits of land that could otherwise be more beneficial to use for the overall welfare of this municipality, that these lands are considered to be an area in need of redevelopment.

Criteria E [(*N.J.S.A.* 40A:12A–5(e))] of all the criteria, it's the criteria that I would point to.

At no point during Stevenson's testimony did he recommend including the Gallenthin property in the redevelopment plan because it was needed for construction of an access road.

Plaintiffs' planning expert, Paul Szymanski, testified regarding the application of the statutory criteria. Szymanski began by emphasizing that Stevenson's recommendation was based exclusively on *N.J.S.A.* 40A:12A–5(e), not the alternative theory expressed in the URS report that the property may be an important adjunct to the BP/Dow Redevelopment Area. Szymanski then provided his own interpretation and application of *N.J.S.A.* 40A:12A–5(e):

I'm not sure that "other conditions" is ... as broad as counsel's trying to make it because there [are] other sections in the ... redevelopment law that even are broader and [more] vague[ ]. I think that these "other conditions" relate to the issues dealing with title and ownership and something similar, and I think it should be looked at in a more narrow sense as "similar conditions" rather than any conditions.

Szymanski also testified that in his opinion the current use of the property for farming, open space, and occasional dredging was sufficient to preclude classifying the property as "not fully productive" under *N.J.S.A.* 40A:12A–5(e).

Additionally, Szymanski noted that the Gallenthin property was not necessary for the BP/Dow Redevelopment Area. He observed that because much of the property was protected wetlands, significant development by the Borough was not feasible. He concluded that the Gallenthin property could not contribute meaningfully to the redevelopment plan because an "environmental recreation area" would not produce "key ratables" and would not "achieve the overall goals and objectives of [the] redevelopment program."

George Gallenthin also testified. He reiterated that phragmites had been harvested from the property since 1997 and stated that he was actively pursuing the property's use as a dredging depot. He admitted that he had not obtained the requisite DEP water

permits but testified that the permits were easily obtained once dredging commenced.

At the conclusion of the hearing, the Planning Board determined that the Gallenthin property should be included in the BP/Dow Redevelopment Area. The board emphasized that its decision was based on the reasons expressed in the Remington & Vernick report and Stevenson's testimony. In May 2003, the Governing Body adopted the Planning Board's recommendation and designated the Gallenthin property as a redevelopment area.

### B.

In June 2003, plaintiffs filed a complaint in lieu of prerogative writs, challenging Paulsboro's designation of their property as "in need of redevelopment." Plaintiffs claimed that the Gallenthin property did not meet any of the statutory criteria necessary for that designation. Their complaint further alleged procedural flaws in the Borough's enactment of the redevelopment ordinance and other improprieties by the Borough. The Law Division dismissed plaintiffs' complaint, finding that Paulsboro "meticulously adhered" to the Local Redevelopment and Housing Law's procedural requirements and that the Borough's inclusion of the Gallenthin property in the redevelopment plan was supported by substantial evidence.

The Appellate Division affirmed the trial court's ruling in an unpublished, per curiam opinion. Citing Stevenson's testimony, the nominal "economic benefit" generated from farming phragmites, and the infrequent use of the property as a dredging depot, the Appellate Division concluded that the Borough's decision was supported by substantial evidence. The panel also noted that the Remington & Vernick and URS reports further supported the Borough's decision.

Plaintiffs petitioned this Court for certification, challenging the constitutionality of *N.J.S.A.* 40A:12A–5(e) as applied to their property and the lower courts' application of the substantial evidence standard of review. We granted certification. 188 *N.J.* 492, 909

*A.2d* 727 (2006). We also permitted the following entities to participate as amici curiae: American Planning Association (New Jersey Chapter); Downtown New Jersey, Inc.; Institute for Justice; New Jersey Audubon Society; New Jersey Builders Association; New Jersey Conservation Foundation; New Jersey State League of Municipalities; and Public Advocate of New Jersey.

## II.

Plaintiffs' central claim is that Paulsboro's designation of their property as "in need of redevelopment," and thus subject to eminent domain, is in violation of Article VIII, Section 3, Paragraph 1 of the New Jersey Constitution, which authorizes the taking of "blighted areas" for redevelopment. Plaintiffs argue that the term "blight," as used in the Constitution, carries negative connotations that their property does not possess. Plaintiffs also maintain that their property is not "rationally part of" the BP/Dow Redevelopment Area and cannot be incorporated into the Borough's redevelopment plan under the guise that the parcel is necessary for the overall redevelopment initiative. Plaintiffs further argue that the lower courts incorrectly applied the substantial evidence standard of review. According to plaintiffs, Paulsboro's designation was not supported by substantial evidence because it was based on the net opinion of the Borough's expert.

In response, Paulsboro contends that the Constitution delegates responsibility for defining the term "blighted areas" to the Legislature, which provided clear guidance by enacting the Local Redevelopment and Housing Law, *N.J.S.A.* 40A:12A–1 to—73. Paulsboro asserts that under the plain language of *N.J.S.A.* 40A:12A–5(e), a planning board may designate property as "in need of redevelopment" so long as the property is "stagnant or not fully productive." Further, Paulsboro argues that "the meanings of 'stagnant' and 'not fully productive'" are interchangeable and "stagnant" should be read to "explain" the phrase "not fully productive." Paulsboro contends that the lower courts correctly

applied the substantial evidence standard and that the record supports the Borough's decision.

We begin by addressing plaintiffs' constitutional challenge to Paulsboro's interpretation of *N.J.S.A.* 40A:12-5(e). Next, because we conclude that Paulsboro's construction of subsection 5(e) would render that provision unconstitutional, we discuss whether *N.J.S.A.* 40A:12A-5(e) is "reasonably susceptible" to an interpretation that complies with the Constitution. Finally, we briefly address the parties' arguments regarding the standard of review for municipal redevelopment designations.

## III.

### A.

This Court has long recognized that the State possesses authority to take private property, restricted "only by the pertinent clauses of [our] Constitution." *Abbott v. Beth Israel Cemetery Ass'n,* 13 *N.J.* 528, 545, 100 *A.2d* 532 (1953). The Constitution imposes three significant limitations on the State's eminent domain power. *See generally* Robert F. Williams, *The New Jersey State Constitution* 47–48, 71, 118–19 (1997) (discussing restrictions on eminent domain). First, the State must pay "just compensation" for property taken by eminent domain. *N.J. Const.* art. I, ¶ 20. Second, no person may be deprived of property without due process of law. *Twp. of W. Orange v. 769 Assocs.,* 172 *N.J.* 564, 572, 800 *A.2d* 86 (2002). Third, and germane to this appeal, the State may take private property only for a "public use." *N.J. Const.* art. I, ¶ 20; *see Twp. of W. Orange, supra,* 172 *N.J.* at 572, 800 *A.2d* 86.

In respect of the "public use" requirement, Article VIII, Section 3, Paragraph 1 of the Constitution (Blighted Areas Clause) provides:

The clearance, replanning, development or redevelopment of *blighted areas shall be a public purpose and public use, for which private property may be taken or acquired.* Municipal, public or private corporations may be authorized by law to undertake such clearance, replanning, development or redevelopment; and im-

provements made for these purposes and uses, or for any of them, may be exempted from taxation, in whole or in part, for a limited period of time.... The conditions of use, ownership, management and control of such improvements shall be regulated by law.

[(Emphasis added).]

Pursuant to that authorization, the Legislature enacted the Local Redevelopment and Housing Law (LRHL), *N.J.S.A.* 40A:12A–1 to –49, which empowers municipalities to designate property as "in need of redevelopment" and thus subject to the State's eminent domain power. *See N.J.S.A.* 40A:12A–3 (defining "redevelopment area" or "in need of redevelopment" as pursuant to constitutional authority of Blighted Areas Clause). In designating the Gallenthin property as "in need of redevelopment," Paulsboro relied on *N.J.S.A.* 40A:12A–5(e), which permits a municipality to classify land as "in need of redevelopment" if it finds a

growing lack or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein *or other conditions,* resulting in a stagnant *or* not fully productive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare.

[(Emphasis added).]

Paulsboro therefore asserts that an area may be classified as "in need of redevelopment" so long as it is "not fully productive" and the property is "potentially useful and valuable for contributing to and serving the public health, safety and welfare." According to Paulsboro, the phrase "other conditions" refers to *any* possible condition. Paulsboro also claims that because the statute literally reads "stagnant *or* not fully productive," subsection 5(e) "is most reasonably read to interchange the meanings of 'stagnant' and 'not fully productive.' "

Plaintiffs respond that Paulsboro's interpretation of *N.J.S.A.* 40A:12A–5(e) is unconstitutional because it exceeds the Blighted Areas Clause's delegation of authority. According to plaintiffs, the Blighted Areas Clause authorizes the redevelopment of only "blighted areas" and Paulsboro's interpretation of subsection 5(e) impermissibly extends a municipality's redevelopment authority to any property that is "not fully productive."

■ This appeal therefore requires us to ascertain the meaning of the term "blighted" as used in the New Jersey Constitution, and determine whether Paulsboro's interpretation of *N.J.S.A.* 40A:12A–5(e) is within the scope of that term. Because those issues present questions of law, we review them de novo. *Hodges v. Sasil Corp.*, 189 *N.J.* 210, 220–21, 915 *A.*2d 1 (2007) (citing *Balsamides v. Protameen Chems., Inc.*, 160 *N.J.* 352, 372, 734 *A.*2d 721 (1999)).

## B.

As a threshold matter, Paulsboro iterates that the Blighted Areas Clause authorizes the Legislature, not the Judiciary, to define "blight," and, therefore, we must endorse the LRHL's definition of that concept. Several amici curiae also contend that because the Blighted Areas Clause concerns only a grant of authority to the Legislature, the clause cannot be the source of a private constitutional protection. Those contentions are misguided.

■ Although the Blighted Areas Clause undoubtedly enlarges the Legislature's eminent domain power to include the taking of private property for redevelopment purposes, *see Wilson v. City of Long Branch*, 27 *N.J.* 360, 381–82, 142 *A.*2d 837 (stating that Blighted Areas Clause authorizes Legislature to enact enabling legislation), *cert. denied*, 358 *U.S.* 873, 79 *S.Ct.* 113, 3 *L.Ed.*2d 104, (1958), the Judiciary is the final arbiter of the institutional commissions articulated in the Constitution, *see Sherman v. Citibank*, 143 *N.J.* 35, 58, 668 *A.*2d 1036 (1995) ("It is emphatically the province and duty of the judicial department to say what the law is.") (quoting *Marbury v. Madison*, 5 *U.S.* (1 Cranch) 137, 177, 2 *L.Ed.* 60, 71 (1803)), *vacated on other grounds*, 517 *U.S.* 1241, 116 *S.Ct.* 2493, 135 *L.Ed.*2d 186 (1996). Our Constitution makes clear that "[a]ll political power is inherent in the people" and that "[g]overnment is instituted for the protection, security and benefit of the people." *N.J. Const.* art. I, ¶ 2. By adopting the Blighted Areas Clause, the People entrusted certain powers to the Legisla-

ture, and the courts are responsible for ensuring that the terms of that trust are honored and enforced. We find no merit to Paulsboro's assertion that the Blighted Areas Clause divests the Judiciary of that responsibility.

Further, the Blighted Areas Clause authorizes governmental entities to exercise eminent domain power in respect of "blighted areas." *N.J. Const.* art. VIII, § 3, ¶ 1. The provision grants authority to those entities only to the extent allowed by our State Constitution. The clause operates as both a grant and limit on the State's redevelopment authority. The contention that the clause cannot be the basis for invalidating municipal action is thus incorrect.

## IV.

We now turn to whether Paulsboro's interpretation of *N.J.S.A.* 40A:12A–5(e) violates the Blighted Areas Clause. The Constitution is, above all, an embodiment of the will of the People, and this Court's responsibility as final expositor is to ascertain and enforce that mandate. *See Bd. of Chosen Freeholders of Morris v. State,* 159 *N.J.* 565, 575–76, 732 *A.*2d 1053 (1999). Generally, the surest indicator of that intent is a provision's plain language. *See Gangemi v. Berry,* 25 *N.J.* 1, 10, 134 *A.*2d 1 (1957). However, "[w]here the text is unclear or ambiguous . . . a court may look to sources beyond the Constitution itself to ascertain the fundamental purpose underlying the language." *Bd. of Chosen Freeholders of Morris, supra,* 159 *N.J.* at 576, 732 *A.*2d 1053 (citing *Lloyd v. Vermeulen,* 22 *N.J.* 200, 206, 125 *A.*2d 393 (1956)).

Additionally, when evaluating a constitutional challenge to a statute, we presume that "the [L]egislature acted with existing constitutional law in mind and intended the [statute] to function in a constitutional manner." *State v. Profaci,* 56 *N.J.* 346, 349, 266 *A.*2d 579 (1970) (citations omitted). "[E]ven though a statute may be open to a construction which would render it unconstitutional or permits its unconstitutional application, it is the duty of this Court to so construe the statute as to render it

constitutional if it is reasonably susceptible to such interpretation." *State v. Miller*, 170 *N.J.* 417, 433, 790 *A*.2d 144 (2002) (quotation and citations omitted).

### A.

"Blight" is generally defined as "[s]omething that impairs growth, withers hopes and ambitions, or impedes progress and prosperity." *American Heritage Dictionary* 196 (4th ed. 2000); *see New Oxford American Dictionary* 177 (2d ed. 2005) (defining "blight" as "an ugly, neglected, or rundown condition of an urban area"). In 1938, an influential urban planner and author defined "blight" as "an area in which deteriorating forces have obviously reduced economic and social values to such a degree that widespread rehabilitation is necessary to forestall the development of an actual slum condition." Mabel L. Walker, *Urban Blight and Slums* 5 (1938). A more recent definition, as used in the context of urban redevelopment, describes "blight" as "an area, usually in a city, that is in transition from a state of relative civic health to the state of being a slum, a breeding ground for crime, disease, and unhealthful living conditions." Hudson Hayes Luce, *The Meaning of Blight: A Survey of Statutory and Case Law*, 35 *Real Prop. Prob. & Tr. J.* 389, 393 (2000). Thus, the term presumes deterioration or stagnation that negatively affects surrounding areas.

The word was incorporated into our Constitution when the 1947 Constitutional Convention adopted the Blighted Areas Clause. According to Delegate Jane Barus, who sponsored the Blighted Areas Clause, the provision was intended to enable the "rehabilitation of our cities." *Proceedings of the New Jersey Constitutional Convention of 1947,* vol. I at 744. Barus described the impetus for the clause as follows:

Certain sections of [the older cities in the State] have fallen in value, and have [become] what [are] known as "blighted" or "depressed" areas. This has happened, sometimes, because the population has shifted from one part of the town to another, or one section has become overcrowded. Sometimes it has happened because the district has turned to business instead of residential, or partly to

business; and sometimes simply because the buildings themselves, although they were originally good and may have been fine homes, have become so outdated and obsolescent that they are no longer desirable, and hence, no longer profitable.

These depressed areas go steadily down hill. The original occupants move away, the rents fall, landlords lose income and they make up for it by taking in more families per house. It's impossible to keep the properties in good condition, the houses deteriorate more and more, and what was once a good section of the town is on the way to becoming a slum.

Naturally, this slump in value is not confined to the original area affected. It spreads to neighboring blocks. No one person ... can counteract this spread, because no one can afford to sink money into a blighted area ... because the improvement is so small that it cannot turn the tide of deterioration.
[*Id.* at 742–43.]

Barus also noted that prior legislation aimed at "slum clearance" had been unsuccessful in securing private investment because of the understandable fear that those statutes would be declared unconstitutional. *Id.* 743–44. The Blighted Areas Clause was intended to alleviate those concerns and facilitate investment in blighted areas. *Id.* at 744; *see McClintock v. City of Trenton,* 47 *N.J.* 102, 105, 219 *A.*2d 510 (1966) ("[T]his blighted area provision was adopted to remove any doubts with regard to earlier pertinent legislation.") (citations omitted).

The legislation referenced by Barus, the 1944 Redevelopment Companies Law, *L.* 1944, *c.* 169, and the 1946 Urban Redevelopment Law, *L.* 1946, *c.* 52, contained descriptions of "blight." The Redevelopment Companies Law described "blighted areas" as "areas ... where there exist substandard conditions and [un]sanitary housing conditions owing to obsolescence, deterioration and dilapidation of buildings, or excessive land coverage, lack of planning, of public facilities, of sufficient light, air and space, and improper design and arrangement of living quarters." *L.* 1944, *c.* 169, § 2. Likewise, the Urban Redevelopment Law sought to remedy "congested, dilapidated, substandard, unsanitary and dangerous housing conditions," which were a "menace" and a "social and economic liabilit[y]." *L.* 1946, *c.* 52, § 2.

Accordingly, in adopting the Blighted Areas Clause, the framers were concerned with addressing a particular phenomenon, namely, the deterioration of "certain sections" of "older cities" that were

causing an economic domino effect devastating surrounding properties. The Blighted Areas Clause enabled municipalities to intervene, stop further economic degradation, and provide incentives for private investment.

### B.

Our Constitution, however, is "a living charter—designed to serve the ages and to be adaptable to the developing problems of the times." *Vreeland v. Byrne*, 72 *N.J.* 292, 328, 370 *A.*2d 825 (1977) (footnote omitted). Thus, in 1958, we upheld the constitutionality of the Blighted Areas Act's (BAA) progressive definition of "blight." *Wilson, supra,* 27 *N.J.* at 378–82, 142 *A.*2d 837. The BAA was the predecessor of the statute at issue in this appeal, the LRHL, and it contained a provision substantially similar to *N.J.S.A.* 40A:12A–5(e). Under the BAA's subsection (e), an area was "blighted" if there was:

A growing or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein and other conditions, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare.[3]

[*N.J.S.A.* 40:55–21.1(e) (repealed 1992) (emphasis added).]

In upholding that definition of blight, we observed:

Community redevelopment is a modern facet of municipal government. Soundly planned redevelopment can make the difference between continued stagnation and decline and a resurgence of healthy growth. It provides the means of removing the decadent effect of slums and blight on neighboring property values, of opening up new areas for residence and industry. In recent years, recognition has grown that governing bodies must either plan for the development or redevelopment of urban areas or permit them to become more congested, deteriorated, obsolescent, unhealthy, stagnant, inefficient and costly.

[*Wilson, supra,* 27 *N.J.* at 370, 142 *A.*2d 837.]

Recognizing the important role of redevelopment in our society, we concluded that the BAA's definition of blight was within the bounds of the Constitution. *Id.* at 382, 142 *A.*2d 837 ("[N]o

---

[3] The LRHL's subsection 5(e) contains the phrase *"or other conditions"* instead of *"and* other conditions." *N.J.S.A.* 40A:12A–5(e) (emphasis added). The Legislature also changed "stagnant *and* unproductive" to "stagnant *or not fully* productive." *Ibid.* (emphasis added).

reasonable argument can be made that the connotation ascribed to ['blight'] overreaches the public purpose sought to be promoted by the Constitution.").

In 1971, we revisited the validity of the BAA's definition of "blight" and held that the BAA applied to more than "slum clearance." *Levin v. Twp. Comm. of Bridgewater*, 57 *N.J.* 506, 511–16, 545, 274 *A.*2d 1 (1971); *see also Jersey City Chapter of the Prop. Owners' Prot. Ass'n v. City Council of Jersey City*, 55 *N.J.* 86, 96, 259 *A.*2d 698 (1969) (noting that BAA applied to more than "perceptually offensive slums"). Specifically, we approved redevelopment plans aimed at "suburban and rural" areas and upheld the acquisition of land in that context. *Levin, supra*, 57 *N.J.* at 512, 274 *A.*2d 1. Thus, *Levin* expanded the definition of "blight" to include areas that were not necessarily contemplated by the framers but were within the "true sense and meaning" of the term. *See Bd. of Chosen Freeholders of Morris, supra*, 159 *N.J.* at 576, 732 *A.*2d 1053 (explaining that Constitution must accommodate "true sense and meaning of the language used") (quotation and citations omitted).

That said, "blight" still has a negative connotation. In *Levin, supra*, for example, we found that the parcels at issue were preventing the "proper development" of surrounding properties because they "had reached a stage of stagnation and unproductiveness." 57 *N.J.* at 512, 538, 274 *A.*2d 1. In *Wilson, supra*, we noted that much of the designated area contained "dilapidated homes and other buildings, which were obviously beyond restoration," 27 *N.J.* at 394, 142 *A.*2d 837, and we observed that community redevelopment was a means of "removing the decadent effect ... on neighboring property values," *id.* at 370, 142 *A.*2d 837. Although the meaning of "blight" has evolved, the term retains its essential characteristic: deterioration or stagnation that negatively affects surrounding properties.

## C.

That articulation of the term's essential meaning is consistent with other states' statutory definitions of "blight." In 2000,

Hudson Hayes Luce conducted a comparative survey of statutory and case law defining the term "blight." Luce, *supra*, 35 *Real Prop. Prob. & Tr. J.* at 394 (noting that all fifty states, District of Columbia, Guam, Puerto Rico, and Virgin Islands have statutorily defined "blight"). Although Luce noted variation among the fifty-four statutes defining "blight," he observed that they all contained common language such as: " 'Constitutes an economic and social liability,' 'conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime,' and 'detrimental (or a menace) to the public safety, welfare, or morals.' " *Id.* at 403.

Conversely, Luce's survey reveals that only eight states and the District of Columbia permit local governments to classify property as "blighted" based on an economic evaluation of the property's use. *Id.* at 401, 403. Moreover, even within those jurisdictions, courts tend to hold that property is not "blighted" if the only statutory criterion identified by the redevelopment agency is the "not fully productive" use of the land. *Id.* at 464.

For example, in *Sweetwater Valley Civic Ass'n v. City of National City,* 18 *Cal.*3d 270, 133 *Cal.Rptr.* 859, 555 *P.*2d 1099, 1103 (1976), the California Supreme Court held that "it is not sufficient to merely show that the area is not being put to its optimum use, or that the land is more valuable for other uses." Rather, according to the court, "blighted" property presents "a real hindrance to the development of the city [which] cannot be eliminated or improved without public assistance." *Ibid.*; *see, e.g., Regus v. City of Baldwin Park,* 70 *Cal.App.*3d 968, 139 *Cal.Rptr.* 196, 203 (1977) (holding that area was not blighted because "there is no evidence to show that the [p]roject area is either a social or an economic liability—except in the sense that it might be made more profitable to the [c]ity than it now is"); *Sw. Ill. Dev. Auth. v. Nat'l City Envtl., LLC,* 304 *Ill.App.*3d 542, 238 *Ill.Dec.* 99, 710 *N.E.*2d 896, 904 (1999) ("In this case we have no blight.... [A] condemning authority is [not] justified in using its power of eminent domain to take private property from an unwilling seller and to transfer it to another private enterprise to increase the

profits of that enterprise."), *aff'd,* 199 *Ill.*2d 225, 263 *Ill.Dec.* 241, 768 *N.E.*2d 1 (2002).

## D.

█ We recognize that government redevelopment is a valuable tool for municipalities faced with economic deterioration in their communities. As noted, our Constitution expressly authorizes municipalities to engage in redevelopment of "blighted areas." However, Paulsboro interprets subsection 5(e) to permit redevelopment of any property that is "stagnant or not fully productive" yet potentially valuable for "contributing to and serving" the general welfare. Under that approach, any property that is operated in a less than optimal manner is arguably "blighted." If such an all-encompassing definition of "blight" were adopted, most property in the State would be eligible for redevelopment. We need not examine every shade of gray coloring a concept as elusive as "blight" to conclude that the term's meaning cannot extend as far as Paulsboro contends. At its core, "blight" includes deterioration or stagnation that has a decadent effect on surrounding property. We therefore conclude that Paulsboro's interpretation of *N.J.S.A.* 40A:12A–5(e), which would equate "blighted areas" to areas that are not operated in an optimal manner, cannot be reconciled with the New Jersey Constitution.

## V.

 We now address whether *N.J.S.A.* 40A:12A–5(e) is "reasonably susceptible" to an alternative interpretation that conforms to the Blighted Areas Clause. A court's goal when interpreting a statute is to give effect to the Legislature's intent. *See SASCO 1997 NI, LLC v. Zudkewich,* 166 *N.J.* 579, 586, 767 *A.*2d 469 (2001). Generally, the statute's plain language is the most reliable indicium of that intent. *See L.W. v. Toms River Reg'l Schs. Bd. of Educ.,* 189 *N.J.* 381, 400, 915 *A.*2d 535 (2007). However, we presume that the Legislature "intended the [statute] to function in a constitutional manner," and "articulation of the

elements which furnish that essential intent need not appear in the statutory language." *Profaci, supra,* 56 *N.J.* at 349, 266 *A.*2d 579 (citation omitted). Thus, under New Jersey law, "a challenged statute will be construed to avoid constitutional defects if the statute is 'reasonably susceptible' of such construction." *Bd. of Higher Educ. v. Bd. of Dirs. of Shelton Coll.,* 90 *N.J.* 470, 478, 448 *A.*2d 988 (1982) (citing *Profaci, supra,* 56 *N.J.* at 350, 266 *A.*2d 579).

### A.

The overall structure of *N.J.S.A.* 40A:12A–5 suggests that the Legislature did not intend subsection (e), which pertains to defects in title and diversity of ownership, to be as broadly applied as Paulsboro contends. The Legislature included eight subsections within *N.J.S.A.* 40A:12A–5, any one of which may be the basis for designating property as "in need of redevelopment." *See Concerned Citizens of Princeton, Inc. v. Mayor of Princeton,* 370 *N.J.Super.* 429, 435–36, 851 *A.*2d 685 (App.Div.), *certif. denied,* 182 *N.J.* 139, 861 *A.*2d 844 (2004). Although there is a degree of overlap between those criteria, *see, e.g., ibid.* (finding both subsections (d) and (e) applicable), under Paulsboro's interpretation, subsection (e) would entirely subsume several other subsections. For example, subsection (b) permits a planning board to include property in a redevelopment area if the property contains "buildings previously used for commercial, manufacturing, or industrial purposes; the abandonment of such buildings; or the same being allowed to fall into so great a state of disrepair as to be untenantable." *N.J.S.A.* 40A:12A–5(b). Under subsection (c), a redevelopment designation is also appropriate where

> unimproved vacant land ... has remained so for a period of ten years ... and[,] by reason of its location, remoteness, lack of means of access to developed sections or portions of the municipality, or topography, or nature of the soil, is not likely to be developed through the instrumentality of private capital.
>
> [*N.J.S.A.* 40A:12A–5(c).]

If Paulsboro's interpretation of subsection (e) were adopted, land that qualifies under either subsection (b) or (c) would also

surely qualify as "not fully productive" under subsection (e), rendering subsections (b) and (c) superplusage. Although statutory provisions often overlap, under Paulsboro's interpretation, subsection (e) would entirely envelop several other subsections.

Further, within subsection (e) and immediately before the phrase "other conditions," the Legislature listed two specific criteria that trigger the applicability of the subsection, namely, "diverse ownership" and "condition of the title." If "other conditions" is interpreted to mean any condition, those two phrases, which are conspicuously descript, would be redundant and subsection (e) would be applicable in any event.

Because we seek to avoid rendering any part of a statute meaningless, *State v. Reynolds,* 124 *N.J.* 559, 564, 592 *A.*2d 194 (1991), we cannot accept the Planning Board's conclusion that subsection (e) applies to any parcel that is "not fully productive." Rather, in view of the statute's context and structure, a reasonable interpretation of *N.J.S.A.* 40A:12A–5 is that each subsection provides, at least to a degree, an independent basis for designating property as "in need of redevelopment."

Consequently, the phrase "or other conditions" should be interpreted in accordance with the *ejusdem generis* principle of statutory construction. *See State v. Hoffman,* 149 *N.J.* 564, 584, 695 *A.*2d 236 (1997). Under that canon of statutory interpretation, "where general words follow specific words in a statutory enumeration, the general words are construed to embrace *only objects similar in nature* to those objects enumerated by the preceding specific words." 2A Norman J. Singer, *Sutherland Statutory Construction* § 47:17 (6th ed. 2000) (emphasis added).

The phrase "other conditions" is not a universal catch-all that refers to any eventuality. Rather, it refers to circumstances of the same or like piece as conditions of title or diverse ownership. In that respect, we are in substantial agreement with Judge Pressler's conclusion in *Forbes v. Board of Trustees of South Orange Village,* 312 *N.J.Super.* 519, 526–27, 712 *A.*2d 255 (App. Div.), *certif. denied,* 156 *N.J.* 411, 719 *A.*2d 642 (1998), that the

1992 alteration to *N.J.S.A.* 40A:12A–5(e) should be viewed as the substantial equivalent of the BAA's subsection (e).

We also must presume that the Legislature did not intend the phrase "stagnant or not fully productive" to create two alternative criteria for designating property as in need of redevelopment. As discussed above, such an interpretation would exceed the meaning of "blight" and render *N.J.S.A.* 40A:12A–5(e) unconstitutional. Rather, the term "not fully productive" must be viewed as elaborating on the operative criterion, that is, "stagnant." *See State v. Holland,* 132 *N.J.Super.* 17, 24, 331 *A.*2d 626 (App.Div.1975) ("[I]t has long been settled that the disjunctive 'or' in a ... statute may be construed as the conjunctive 'and' if to do so is consistent with the legislative intent.") (citing *Baum v. Cooper,* 131 *N.J.L.* 574, 575, 37 *A.*2d 830 (Sup.Ct.1944)).

## B.

That interpretation is supported by *Levin, supra,* where we upheld the constitutionality of subsection (e) of the LRHL's predecessor, the BAA, and addressed subsection (e)'s intended scope. 57 *N.J.* 506, 274 *A.*2d 1. Regarding the particular problem subsection (e) was intended to address, we observed:

> The lawmakers recognized that where an undeveloped land area was burdened with defective, questionable or unusual conditions of title, unsuitable lot layouts, diverse ownership, and outmoded and undeveloped street patterns, serious difficulties stood in the way of a unified development which would serve the health, welfare, social and economic interests, and sound growth of the community. They knew that fractionalization could be eliminated and the area dealt with as a whole if it could be treated as blighted and if the municipal power of eminent domain could be exercised to expeditiously bring it into such ownership as would permit realization of its maximum potential as part of an orderly community growth. The conclusion is inescapable that subsection (e) was added to the blighted area statute in order to make such a result possible.
>
> [*Id.* at 515, 274 *A.*2d 1.]

We thus recognized that the Legislature intended subsection (e) to apply in circumstances where the orderly development of a particular area is frustrated by its peculiar configuration. That is, subsection (e) was meant to apply to areas that for a variety of

reasons—such as diversity of ownership and conditions of title—were not susceptible to unified development. The subsection enabled State agencies and local government to facilitate redevelopment by eradicating impediments to sound land use planning.

Indeed, the area at issue in *Levin* contained "many problems associated with (1) diverse ownership of the lots, (2) questionable or invalid titles resulting from defective tax foreclosure proceedings, (3) . . . conflicting conveyances . . . , [and] (4) the need for vacation of many paper streets in order to provide proper and convenient . . . ingress and egress." *Id.* at 531, 274 *A.*2d 1. Those issues created a situation where redevelopment could not occur without municipal intervention. *Id.* at 539, 274 *A.*2d 1.

Moreover, we observed that in addition to suffering from fragmentation, the area at issue had deteriorated to such an extent that it could accurately be described as "stagnant and unproductive." *Id.* at 515, 274 *A.*2d 1. We characterized the land as "fallow," *id.* at 540, 274 *A.*2d 1, and suffering from "a long standing condition of stagnation and unproductiveness," *id.* at 539, 274 *A.*2d 1. Our approval of municipal redevelopment was not based on underutilization or the property's "not fully productive" use. Rather, we found that the area was subject to government redevelopment because, as a result of suffering from defects of title, and the like, it had become stagnant. It was that scenario—stagnation caused by fractionalization of properties—that rendered the application of subsection (e) constitutional.

## C.

Our interpretation of subsection (e) is further supported by its legislative origins. When the Legislature enacted the BAA in 1949, that statute did not contain any provision analogous to subsection (e). *See L.* 1949, *c.* 187. However, the 1949 Legislature amended the Local Housing Authorities Law, *L.* 1949, *c.* 300, and enacted the Redevelopment Agencies Law, *L.* 1949, *c.* 306, to include provisions nearly identical to what would become subsection (e) of the BAA (and, later, subsection 5(e) of the LRHL). In

1951, so as to "make uniform the definition of 'blighted areas,'" the Legislature added to the BAA the same language it had included in the other statutes. *R.S. Cum.Supp.* 40:55–21.1 (1951) (statement attached to *L.* 1951, *c.* 248 amending BAA).

Significantly, the 1949 addition to the Local Housing Authorities Law contained the following legislative declaration about that statute's blighted areas provision:

> [T]here are ... certain areas where the condition of the title, the diverse ownership of the land to be assembled, the street or lot layouts, or other conditions prevent a proper development of the land, and that it is in the public interest that such areas, as well as blighted areas, be acquired by eminent domain and made available for sound and wholesome development in accordance with a redevelopment plan, and that the exercise of the power of eminent domain and the financing of the acquisition and preparation of land by a public agency for such redevelopment is likewise a public use and purpose.
>
> [*L.* 1949, *c.* 300, § 1.]

The Redevelopment Agencies Law contained a similar explanation regarding its version of subsection (e). It noted that the provision was added to include property that was blighted or becoming blighted due to "inadequate planning of the area, or excessive land coverage, or deleterious land use, or the unsound subdivision plotting and street and road mapping, or obsolete layout, or a combination of these factors." *L.* 1949, *c.* 306, § 2.

In sum, because we must presume that the Legislature intended subsection (e) to function in a constitutional manner, and because subsection (e) is reasonably susceptible to an alternative interpretation, we conclude that the Legislature intended *N.J.S.A.* 40A:12A–5(e) to apply only to property that has become stagnant because of issues of title, diversity of ownership, or other similar conditions. By adopting that construction, we avoid rendering *N.J.S.A.* 40A:12A–5(e) unconstitutional and give effect to the Legislature's original purpose in adopting the language that would become subsection 5(e).

### D.

▮▮▮ Here, Paulsboro's sole reason for designating the Gallenthin property as "in need of redevelopment" was that plaintiffs

were not utilizing the property in a fully productive manner. According to Stevenson, the town planner, *N.J.S.A.* 40A:12A–5(e) was satisfied "because we have vacant, unimproved conditions, [and] because there [are] bits of land that could otherwise be more beneficial to ... the overall welfare of this municipality." The Remington & Vernick report also concluded that the Gallenthin property was in need of redevelopment because plaintiffs were not optimizing use of the property. The Borough expressly based its designation on Stevenson's testimony and the Remington & Vernick report. Those considerations, standing alone, are insufficient to engage the sovereign's power to designate property as "in need of development" and subject to eminent domain.

Further, there is no evidence in the record that the broader redevelopment area suffered from "[a] growing lack or total lack of proper utilization" caused by "condition of the title ... of the real property therein." *N.J.S.A.* 40A:12A–5(e). Rather, the record proves that plaintiffs own their property with clear, quieted title, and the Remington & Vernick report contained no reference to title defects or ownership problems associated with any property included in the redevelopment plan.

The record is also silent whether the Borough considered the benefits of protected wetlands in finding that the property was in need of redevelopment. The legislative findings accompanying the Freshwater Wetlands Protection Act, *N.J.S.A.* 13:9B–1 to—30, reveal that freshwater wetlands provide a host of social goods, including protecting and preserving drinking water supplies, preventing loss of life and property, retarding soil erosion, and providing essential habitat for a major portion of New Jersey wildlife. *N.J.S.A.* 13:9B–2. The Legislature also found that "the public benefits arising from the natural functions of freshwater wetlands, and the public harm from freshwater wetland losses, are distinct from and may exceed the private value of wetland areas." *Ibid.* At the very least, the Borough should have considered those benefits.

Finally, although non-blighted parcels may be included in a redevelopment plan if necessary for rehabilitation of a larger blighted area, *see Levin, supra,* 57 *N.J.* at 539–40, 274 *A.*2d 1, the record contains no evidence suggesting that the Gallenthin property is integral to the larger BP/Dow Redevelopment Area or that the Planning Board based its determination on anything other than the property's "not fully productive" use. Even the URS report, which mentioned the Gallenthin property in connection with an access road for the BP/Dow site, concluded that the property was undesirable for that purpose because of "wetlands and ownership issues." Thus, assuming arguendo that Paulsboro based its designation on the need for an access road, this record in fact undermines, rather than supports, such a decision. Paulsboro does not present a situation where the subject property is in any way connected to a larger redevelopment plan. If that were the case, the result may have been different.

Because Paulsboro's sole basis for classifying the Gallenthin property as "in need of redevelopment" was that the property, in isolation, was "not fully productive," that designation was beyond the scope of *N.J.S.A.* 40A:12A-5(e), and must be invalidated. However, our holding does not prejudice a future inquiry by the Borough concerning whether the Gallenthin property is "in need of redevelopment" based on some other legitimate grounds.

## VI.

Because Paulsboro's redevelopment designation was based on an improper interpretation of the LRHL, we need not address whether there was sufficient evidence on the record to support the Borough's action. Nevertheless, we add these brief comments *regarding the appropriate standard of review for the future guidance of planning boards and courts.*

Although issues of law are subject to de novo review, *Hodges, supra,* 189 *N.J.* at 220–21, 915 *A.*2d 1, municipal redevelopment designations are entitled to deference provided that they are supported by substantial evidence on the record, *N.J.S.A.*

40A:12A–6(b)(5). The substantial evidence standard is not met if a municipality's decision is supported by only the net opinion of an expert. *See, e.g., ERETC v. City of Perth Amboy,* 381 *N.J.Super.* 268, 277–81, 885 *A.*2d 512 (App.Div.2005) (overturning municipal action as based on insufficient evidence).

In general, a municipality must establish a record that contains more than a bland recitation of applicable statutory criteria and a declaration that those criteria are met. Because a redevelopment designation carries serious implications for property owners, the net opinion of an expert is simply too slender a reed on which to rest that determination.

## VII.

Although community redevelopment is an important municipal power, that authority is not unfettered. Our Constitution restricts government redevelopment to "blighted areas." *N.J. Const.* art VIII, § 3, ¶ 1. That limitation reflects the will of the People regarding the appropriate balance between municipal redevelopment and property owners' rights. The New Jersey Constitution does not permit government redevelopment of private property solely because the property is not used in an optimal manner.

We therefore reverse the Appellate Division, invalidate Paulsboro's redevelopment designation in respect of the Gallenthin property, and hold that *N.J.S.A.* 40A:12A–5(e) applies only to property that has become stagnant and unproductive because of issues of title, diversity of ownership, or other conditions of the same kind.

*For reversal*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO, and HOENS—7.

*Opposed*—None.